1  MAYER, BROWN, ROWE & MAW LLP
   IAN N. FEINBERG (SBN 88324)
2  IFEINBERG@MAYERBROWNROSE.COM
   DENNIS S. CORGILL (SBN 103429)
3  DCORGILL@MAYERBROWNROSE.COM
   ERIC B. EVANS (SBN 232476)
4  EEVANS@MAYERBROWNROSE.COM
   Two Palo Alto Square, Suite 300
5  3000 El Camino Real
   Palo Alto, CA  94306-2112
6  Telephone: (650) 331-2000
   Facsimile:  (650) 331-2060
7

8  Attorneys for Plaintiff
   FREECYCLESUNNYVALE,

9

10                    UNITED STATES DISTRICT COURT

11                        NORTHERN DISTRICT

12                        OAKLAND DIVISION

13  FREECYCLESUNNYVALE,                      Case No. C06-00324 CW
    a California unincorporated association,
14                                           PLAINTIFF AND
                   Plaintiff,                COUNTERDEFENDANT
15                                           FREECYCLESUNNYVALE'S NOTICE
           v.                                OF MOTION AND MOTION FOR
16                                           SUMMARY ADJUDICATION UNDER
    THE FREECYCLE NETWORK,                   FED.R.CIV.P. 56
17  an Arizona corporation,
                                             Date:       August 23, 2007
18                 Defendant.                Time:       2:00 p.m.
                                             Before:     Hon. Claudia Wilken
19                                           Location:   Courtroom 2

20  THE FREECYCLE NETWORK, INC., an
    Arizona Corporation,
21
                   Counterclaimant,
22
    v.
23
    FREECYCLESUNNYVALE, a California
24  unincorporated association,

25                 Counterdefendant.

26

27

28

                              NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION
                                                       CASE NO. C06-00324 CW

Dockets.Justia.com

1    TO DEFENDANT AND COUNTERCLAIMANT THE FREECYCLE NETWORK,

2  INC., AND ITS ATTORNEYS OF RECORD:

3    NOTICE IS HEREBY GIVEN that on August 23, 2007, at 2:00 p.m., or as soon

4  thereafter as the matter may be heard, Plaintiff and Counterdefendant FreecycleSunnyvale shall

5  move this Court for summary adjudication against Defendant and Counterclaimant The

6  Freecycle Network, Inc.

7    This motion respectfully asks this Court to enter summary adjudication against The

8  Freecycle Network, Inc., under FED.R.CIV.P. 56. FreecycleSunnyvale seeks summary

9  adjudication with respect to (1) FreecycleSunnyvale's request for a declaration of non-

10  infringement and, in the alternatives, that The Freecycle Network, Inc.'s alleged trademarks are

11  generic or that The Freecycle Network, Inc., engaged in naked licensing, and (2) The Freecycle

12  Network, Inc.'s counterclaims for trademark infringement and unfair competition, all of which

13  are trademark based. FreecycleSunnyvale does not seek summary adjudication of

14  FreecycleSunnyvale's claim of tortious interference with contract. FreecycleSunnyvale asks this

15  Court to enter summary adjudication upon the grounds that, because there is no material issue of

16  fact that The Freecycle Network, Inc., engaged in naked licensing, The Freecycle Network, Inc.,

17  abandoned any trademark rights it might have had in the word "freecycle," the phrase "The

18  Freecycle Network," or a logo containing a stylized version of "freecycle" and the elements of a

19  guitar and bicycle.

20    Plaintiff and Counterdefendant's motion for summary adjudication under FED.R.CIV.P.

21  56 is supported by the following Memorandum of Points and Authorities, the [Proposed] Order,

22  the Declaration of Timothy Oey, the Declaration of Lisanne Abraham, the Declaration of

23  Kenneth A. Hedden, Sr., the Declaration of Miles Dennis Robertson, Jr., the Declaration of

24  Dennis S. Corgill, the file in this matter, any facts or records of which this Court may take

25  judicial notice, and any argument that may be heard by the Court.

26

27

28

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ................................................................................................ 1

II. STATEMENT OF THE ISSUE TO BE DECIDED.................................................. 1

III. STATEMENT OF THE FACTS .......................................................................... 1

   A.  The Parties ............................................................................................. 1

   B.  Online Freecycling.................................................................................. 2

   C.  TFN's Early Contribution To The Freecycling Movement ........................ 3

   D.  FreecycleSunnyvale Joins The Freecycling Movement In October 2003 ............ 3

       1.  Ms. Abraham started the freecyclesunnyvale online group before
           affiliating with TFN .................................................................... 4

       2.  TFN permitted FreecycleSunnyvale to use TFN's logo with only a
           request that the logo not be used for commercial purposes ...................... 4

   E.  Until September 2004, Online Freecycling Operated With Little, If Any,
       Guidance Or Oversight From TFN ............................................................ 6

   F.  Starting In September 2004, TFN Mobilized Volunteer Groups, But None
       Of These Groups Monitored Or Supervised Online Freecycling Groups.............. 9

       1.  New Group Approvers checked new groups for administrative
           criteria, but did not monitor or supervise online freecycling .................... 9

       2.  Group Outreach and Assistance responded to complaints, but did
           not monitor or supervise online freecyling .......................................... 11

       3.  Interim Moderators stepped in to run a group if the moderators
           retired, but did not monitor or supervise online freecycling.................... 11

       4.  The Penguin Patrol educated online freecycling groups about
           TFN's trademark policy and investigated TFN's critics, but did not
           monitor or supervise online freecycling ............................................. 12

   G.  TFN Does Not Have Possession, Custody, Or Control Of The Files Of Its
       Alleged Licensees .................................................................................. 13

IV. LEGAL STANDARD ...................................................................................... 13

V.  ARGUMENT .................................................................................................. 14

   A.  TFN Did Not Establish Quality Standards................................................ 15

   B.  TFN Did Not Retain Contractual Rights To Inspect Or Supervise ................. 16

   C.  TFN Did Not Engage In Quality Control .................................................. 18

   D.  TFN Had No Basis To Rely On Licensee Control Of Quality ........................ 18

   E.  TFN's Belated Trademark Enforcement Does Not Revive Any Trademark
       Rights That Were Forfeited Through Naked Licensing ................................. 19

   F.  TFN Cannot Revive Its Alleged Trademarks Because TFN's Naked
       Licensing Continues .............................................................................. 20

   G.  TFN's Lack Of Enforceable Trademark Rights Requires Summary
       Adjudication On Its Trademark-Related Counterclaims ............................... 21

VI. CONCLUSION................................................................................................ 22

1

TABLE OF AUTHORITIES

2

CASES                                                                    PAGE

3    Anderson v. Liberty Lobby,
         477 U.S. 242 (1986)..................................................................................14
4
     Barcamerica Intern. v. Tyfield Importers, Inc.,
5        289 F.3d 589 (9th Cir. 2002) ................................................................ passim

6    Brookfield Communications, Inc. v .West Coast Entertainment Corp.,
         174 F.3d 1036 (9th Cir. 1999) .....................................................................21
7
     Celotex Corp. v. Catrett,
8        477 U.S. 325 (1986).....................................................................................13

9    Cleary v. News Corp.,
         30 F.3d 1255 (9th Cir.1994) ..................................................................14, 21
10
     Eisenberg v. Insurance Co. of N. America,
11       815 F.2d 1285 (9th Cir. 1987) .....................................................................13

12   First Interstate Bancorp v. Stenquist,
         16 U.S.P.Q. 2d 1704, 1990 WL. 300321 (N.D. Cal. 1990) ...................... passim
13
     Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,
14       826 F.2d 837 (9th Cir.1987) ........................................................................14

15   Glow Industrial v. Lopez,
         252 F. Supp. 2d 962 (C.D. Cal. 2002) ........................................................21
16
     Halo Management, LLC v. Interland, Inc.,
17       76 U.S.P.Q. 2d 1199, 2004 WL. 1781013 (N.D. Cal. Aug. 10, 2004) ............17, 19

18   Lujan v. National Wildlife Federation,
         497 U.S. 871 (1990)......................................................................................14
19
     Mallard Creek Industries, Inc. v. Morgan,
20       56 Cal. App. 4th 426, 65 Cal. Rptr. 2d 461 (1997).......................................21

21   Siegel v. Chicken Delight, Inc.,
         448 F.2d 43 (9th Cir. 1971) ..........................................................................14
22
     Transgro, Inc. v. Ajac Transmission Parts Corp.,
23       768 F.2d 1001 (9th Cir. 1985) ................................................................18, 19

24

STATUTES

25   Cal. Bus. & Prof. Code § 17200 ..........................................................................14

26   Fed. R. Civ. P. 34(a) ............................................................................................20

27   Fed. R.Civ. P. 56.............................................................................................13, 14

28   15 U.S.C. §§ 1114................................................................................................21

**TABLE OF AUTHORITIES (cont'd)**

PAGE

15 U.S.C. § 1055 ..................................................................................................15

15 U.S.C. § 1125(a) .........................................................................................14, 21

15 U.S.C. § 1127 ..................................................................................................15

MISCELLANEOUS

McCarthy on Trademarks and Unfair Competition § 17:6, at 18-42 (4th ed. 2001) ....................15

McCarthy on Trademarks and Unfair Competition § 18:55, at 18-94 (4th ed. 2001) ..................15

McCarthy on Trademarks and Unfair Competition § 18:57 (4th ed. 2001) .................................19

McCarthy on Trademarks and Unfair Competition §§ 18:58-59 (4th ed. 2001) ..........................18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The central issues in this action are whether The Freecycle Network ("TFN") has trademark rights in the word "freecycle," the phrase "The Freecycle Network," and a logo containing a stylized version of "freecycle" and the elements of a guitar and bicycle (collectively "TFN Alleged Marks").  This Court need not reach those issues because TFN abandoned whatever rights TFN had through naked licensing.  When permitting others to use its alleged trademarks, TFN (1) did not establish quality standards for its alleged licensees, (2) did not retain any contractual rights to inspect or supervise its alleged licensees, (3) did not engage in quality control of its alleged licensees' operations, and (4) permitted complete strangers to use its alleged trademarks without having any basis to rely on the quality control efforts of these strangers.  FreecycleSunnyvale is therefore entitled to summary judgment on its claim for a declaration of non-infringement as well as on TFN's counterclaims, all of which are trademark based.

### II.    STATEMENT OF THE ISSUE TO BE DECIDED

Whether TFN abandoned the TFN Alleged Marks through naked licensing when TFN did not (1) establish quality standards, (2) retain contractual rights to control quality, (3) actually control quality, or (4) reasonably rely on alleged licensees to control quality?

### III.    STATEMENT OF THE FACTS

This dispute arises out of the largely internet-based activity of "freecycling," in which a person with an unwanted item—a "freecycler"—gives the item to a stranger rather than sending the item to a landfill.  For online freecycling, local freecycling organizations maintain online groups, such as those available from Yahoo! Corporation.  Online freecyclers visit a local online group to post email messages announcing unwanted items.  When another member of that online group expresses an interest and a transfer is made, the item is "freecycled." *See* Declaration of Lisanne Abraham at ¶¶ 2-3 ["Abraham Dec."]; Declaration of Timothy Oey ¶¶ 3-5 ["Oey Dec."].

#### A.    The Parties

Defendant and Counterclaimant TFN is an Arizona Corporation founded in March 2003.  TFN operates not for profit and has only one full-time employee, Deron Beal, TFN's founder and

1

now Executive Director.  TFN coordinates a network of local freecycling groups and maintains a Web site with links to thousands of groups who use the TFN Alleged Marks.[1]  *See* Oey Dec. ¶ 61 & Exh. JJ.  TFN seeks to control the grassroots freecycling movement by filing trademark infringement reports with Yahoo!, which then terminates online groups at TFN's behest.  *See* Declaration of Miles Dennis Robertson, Jr. ¶ 28 ["Robertson Dec."].

Plaintiff and Counterdefendant FreecycleSunnyvale is a California unincorporated association that has operated in Sunnyvale, California, since October 2003.  FreecycleSunnyvale is a local freecycling group that formerly participated in TFN's network and used all of the TFN Alleged Marks.  *See* Abraham Dec. ¶¶ 8, 10-11, 15; Oey Dec. ¶ 12 & Exh. F.  FreecycleSunnyvale believes that "freecycle" is a generic term that cannot be protected as a trademark.  FreecycleSunnyvale filed this declaratory relief action after TFN caused Yahoo! to terminate FreecycleSunnyvale's online group.  *See* Oey Dec. ¶ 12.  TFN counterclaimed for trademark infringement and unfair competition.

**B.     Online Freecycling**

An online freecycling group is comprised of owners, moderators, and members.  The owners are the ones who register with, and obtain a group service account from, an internet service provider, such as Yahoo! Groups.  The owners control the operation of the group.  The owners select moderators and/or moderate the groups themselves.  Moderators can, but usually do not, review messages that members send to the online group.  Where moderators review and approve messages, a moderator posts the message to the group's home page, which automatically relays the message to the other members.  Members of an online group join a group so that they may send messages to the group and, in turn, read messages that have been posted.  Members do not review messages before those messages are posted.  Typically, the owners and moderators are also members.  *See* Abraham Dec. ¶¶ 2-6; Oey Dec. ¶¶ 7-9.

To freecycle online, an individual first finds an online freecycling group by using Google or another internet search engine and searching on the terms "freecycle" and the name of the local community.  The individual "joins" the group by registering as a member.  Then, the member (a)

---

[1]  TFN's Web site is located at www.freecycle.org.

1   sends an "offer" message to the online group, (b) the "offer" is posted on the group's home page

2   and relayed to members, (c) one or more members who want the item reply to the "offer," and (d)

3   the member offering the item arranges to transfer the item to one of the members wanting the

4   item.  A member can also post a "wanted" message and follow the same process to see if another

5   member has an item that he or she no longer wants. *See* Abraham Dec. ¶ 7; Oey Dec. ¶¶ 6, 13.

6       **C.**    **TFN's Early Contribution To The Freecycling Movement**

7         TFN was founded in March 2003, when freecycling was truly a decentralized and

8   grassroots movement comprised entirely of volunteers.  Although TFN was not the first

9   organization to promote freecycling, TFN did popularize freecycling on the internet. *See* Oey

10  Declaration ¶ 3 & Exh. C.  In particular, TFN set up a Web site showing local volunteers how to

11  set up and moderate online groups using Yahoo! Groups, a free service. *See* Declaration of

12  Kenneth A. Hedden, Sr. ¶ 3 ["Hedden Dec."]; Robertson Dec. ¶ 13.  TFN's Web site also

13  provides links to local groups. *See* Abraham Dec. ¶ 16; Robertson Dec. ¶ 14.

14        In its early days, TFN operated without regard to preserving any rights in its now alleged

15  trademarks or, for that matter, to following the obligations imposed upon a trademark licensor.

16  For example, "freecycle" was commonly used as a generic term, not only on TFN's Web site, but

17  also by TFN's founder and now Executive Director, Deron Beal.  For example, Mr. Beal referred

18  to members of online groups as "freecyclers" and encouraged others to "Keep on Freecyclin'!"

19  *See* Oey Dec. ¶¶ 74(c) & Exh. VV, 74(e) & Exh. XX. *See also* Hedden Dec. ¶¶ 9, 34; Oey Dec. ¶

20  74. *Compare* Amended Complaint ¶ 23 & Exh. 1 (docket # 20 entered Apr. 6, 2006) (copy of

21  home page of TFN's Web site showing generic use of "freecycle") *with* Answer to Amended

22  Complaint ¶ 23 (docket # 46 entered Aug. 8, 2006) (not denying that exhibit is copy of home

23  page of TFN's Web site).

24      **D.**    **FreecycleSunnyvale Joins The Freecycling Movement In October 2003**

25        FreecycleSunnyvale was founded in October 2003, when Lisanne Abraham entered into a

26  contract with Yahoo! for a group service account.  Ms. Abraham had learned about online

27  freecycling from a friend, Albert Kaufman, who owned and moderated an online freecycling

28  group in Portland, Oregon.  In an October 3, 2003, email sent to several of his friends, including

NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION
CASE NO. C06-00324 CW

Ms. Abraham, Mr. Kaufman explained online freecycling and invited his friends to start online freecycling groups in their local communities. Mr. Kaufman encouraged his friends to copy and use anything from his online group. *See* Abraham Dec. ¶ 9 & Exh. A.

### 1.    Ms. Abraham started the freecyclesunnyvale online group before affiliating with TFN

In response to Mr. Kaufman's email, Ms. Abraham contacted Yahoo! and started a Yahoo! online group on October 7, 2003. Ms. Abraham entered into a group service account with Yahoo! independently and without the assistance of Mr. Kaufman, TFN, Mr. Beal or, for that matter, anyone else. Ms. Abraham named the online group "freecyclesunnyvale," because Ms. Abraham lives in Sunnyvale, California, where she promotes local freecycling to this day. By creating freecyclesunnyvale, Ms. Abraham was the founding member of FreecycleSunnyvale,[2] a group of volunteers who, over time, have moderated online groups for freecyclers in the local Sunnyvale area. *See* Abraham Dec. ¶¶ 8, 10.

### 2.    TFN permitted FreecycleSunnyvale to use TFN's logo with only a request that the logo not be used for commercial purposes

Also on October 7, 2003, Ms. Abraham contacted Mr. Kaufman to inquire about getting a logo like the one that she had seen used by Mr. Kaufman's online group. In response, Mr. Kaufman asked Ms. Abraham to contact Mr. Beal so that freecyclesunnyvale could be listed on TFN's Web site. Mr. Kaufman suggested that Ms. Abraham contact Mark Messinger for a logo, and Mr. Kaufman also offered to provide the typefont used in the logo. In the next day or two, Ms. Abraham had a brief telephone conversation with Mr. Beal, marking the first time that the two ever communicated. *See* Abraham Dec. ¶¶ 12-13.

On October 9, 2003, Mr. Beal added freecyclesunnyvale to the list of online freecycling groups on TFN's Web site. Mr. Beal then sent an email to Ms. Abraham, indicating that

---

[2]  "FreecycleSunnyvale," with an uppercase "F" and "S," refers to the Plaintiff and Counterdefendant, a California unincorporated association. By contrast, "freecyclesunnyvale," with a lowercase "f" and "s," refers to the Yahoo! group that was known by that name. FreecycleSunnyvale is comprised of volunteers who moderated the freecyclesunnyvale online group until that group was terminated at TFN's behest. The FreecycleSunnyvale volunteers now own and moderate a Yahoo! Group known as "sunnyvalefree." *See* Abraham Dec. ¶ 8; Oey Dec. ¶¶ 12, 71-72.

freecyclesunnyvale could use TFN's logo, with the only restriction a request not to use the logo

for commercial purposes.  Mr. Beal's email stated, in its entirety:

> Yeah, Sunnyvale!
> You can get the neutral logo from http://www.freeecycle.org , just
> don't use it for commercial purposes or you [sic] maybe Mark or
> Albert can help you to do your own fancy schmancy logo!
>
> Good luck
> Deron

This is the only written communication between TFN and FreecycleSunnyvale regarding use of

TFN's logo.[3]  *See* Abraham Dec. ¶¶ 14 & Exh. C, 16.

Following the suggestions of both Mr. Kaufman and Mr. Beal, Ms. Abraham contacted

Mr. Messinger regarding a logo.  Mr. Messinger agreed to design a logo for Ms. Abraham.

TFN's logo is a stylized depiction of the word "freecycle" containing the elements of a bicycle

and a guitar.  Mr. Messinger modified TFN's logo by adding a similarly stylized version of

"Sunnyvale":



Within a week or so of starting freecyclesunnyvale, Ms. Abraham put the "freecyclesunnyvale"

logo on the homepage of freecyclesunnyvale, where it remained until November 21, 2005, when

Yahoo! terminated freecyclesunnyvale at TFN's behest.[4]  *See* Abraham Dec. ¶¶ 8, 13-15 & Exh.

D; Oey Dec. ¶¶ 12 & Exh. F, 71.

When Ms. Abraham started freecyclesunnyvale, she also posted an "etiquette" on the

home page of freecyclesunnyvale.  An "etiquette" is a guideline for members of an online group

---

[3]  FreecycleSunnyvale does not concede that this email, or any other communication or course of
conduct between TFN and FreecycleSunnyvale constitutes a contract or license.  Rather, this
motion argues that, even if TFN had trademark rights and entered into licenses, TFN abandoned
any trademark rights it might have had through naked licensing.

[4]  TFN subsequently made changes to its logo by adopting a slightly different bicycle and guitar.
*See also* Hedden Dec. ¶ 14; Robertson Dec. ¶ 29.  The freecyclesunnyvale logo depicted in the
text contains TFN's logo as it originally appeared in October 2003.

to follow when posting messages to the group. Ms. Abraham based the etiquette on one posted on either Mr. Kaufman's group for Portland, Oregon, or Mr. Beal's group for Tucson, Arizona. For example, the etiquette uses "Sunnyvale Freecycle Network" as a name for freecyclesunnyvale. Other than noting that the exchange of pets should be legal, the etiquette for freecyclesunnyvale did not provide any restrictions or guidance as to what kinds of items could be posted for freecycling. *See* Abraham Dec. ¶ 11.

Of importance is what did not happen when FreecycleSunnyvale affiliated its online group with TFN and began using TFN's logo. There were no contracts. There were no discussions of any requirements, restrictions, or conditions on the use of the word "freecycle" or the phrase "The Freecycle Network." At this time, freecycling was a grassroots movement, and neither TFN nor Mr. Beal made any effort to control local groups by asserting trademark rights. *See also* Oey Dec. ¶ 15.

**E.    <u>Until September 2004, Online Freecycling Operated With Little, If Any, Guidance Or Oversight From TFN</u>**

Until September 2004, the online freecycling movement remained a grassroots movement where local groups ran themselves. As the online freecylcing movement grew, new online groups started with little, if any, assistance from TFN. Individuals with experience as moderators of online groups started new freecycling groups with no assistance. For example, when Miles Robertson of Stillwater, Oklahoma, emailed Mr. Beal about starting an online freecycling group, Mr. Beal suggested that he become a member of one or two existing online freecycling groups to see how those groups operated. Otherwise, Mr. Robertson was on his own. Individuals without experience as moderators of online groups could visit TFN's Web site for instructions on how to obtain a group service account from Yahoo! and how to moderate an online freecycling group. *See* Hedden Dec. ¶ 3; Robertson Dec. ¶¶ 2-7.

Groups were listed on TFN's Web site without any approval process whatsoever. For example, Kenneth Hedden of Schroon Lake, New York, started seven online freecycling groups in New York. These groups were up and running before Mr. Hedden provided TFN with the information needed to list his groups on TFN's Web site. Mr. Hedden's groups were added to

TFN's Web site without any approval process, typically within twenty-four hours of his request. *See* Hedden Dec. ¶¶ 7-10; Robertson Dec. ¶ 8.

Throughout this process of setting up online freecycling groups, newly formed groups freely borrowed material from each other. A new group owner would use files from other online groups—such as the "etiquette" file—as a template for their own files. Groups also used TFN's logo. *See* Hedden Dec. ¶¶ 5, 7; Robertson Dec. ¶¶ 2, 4.

Again, of importance during this time period is what did not happen when new online freecycling groups affiliated with TFN and began using TFN's logo. There were no contracts. There were no discussions of any requirements, restrictions, or conditions on the use of the word "freecycle," the phrase "The Freecycle Network," or TFN's logo. Neither TFN nor Mr. Beal made any effort to control local groups by asserting trademark rights. *See* Hedden Dec. ¶ 10; Robertson Dec. ¶ 8.

In October of 2003, shortly after Ms Abraham started freecyclesunnyvale, Mr. Beal announced that he would start a discussion group for moderators of established online freecycling groups. At this time, there were approximately nineteen online freecycling groups. The names of these groups—such as "freecyclesunnyvale" or "Seattle Freecycle Network"—typically combined "freecycle" or "Freecycle Network" with the name of the local community. *See* Abraham Dec. ¶¶ 17-18 & Exh. E. *See also* Hedden Dec. ¶ 4; Oey Dec. ¶¶ 37-38; Robertson Dec. ¶ 4.

An online discussion group for moderators started in October 2003 and was named "freecyclemoderatorsquad" or "modsquad" for short. The modsquad was an online forum for moderators to post questions about the operation of their online groups. Other moderators could offer advice or suggestions if they wished to do so. Moderators were not required to join the modsquad, much less to participate in discussions. *See* Abraham Dec. ¶ 18; Hedden Dec. ¶ 11; Oey Dec. ¶¶ 16-18; Robertson Dec. ¶ 9.

In January 2004, Mr. Beal asked the moderator members of the modsquad to vote on the issue of whether all online freecycling groups should adopt a rule that posted items should be "free, legal, and appropriate for all ages." Mr. Beal emphasized that neither he nor TFN would

1    make this decision; the decision was left to the moderator members of the modsquad to make.

2    The majority of moderator members participating in the poll voted in favor of "free, legal, and

3    appropriate for all ages." Mr. Beal then announced, on January 11, 2004, that all online

4    freecycling groups "have one true guiding principle: 'Keep it free, legal & appropriate for all

5    ages.' This goes for the posts and the gifts themselves." *See* Abraham Dec. ¶¶ 20 & Exh. G, 21

6    & Exh. H, 22 & Exh. I; Hedden Dec. ¶ 12.

7          Even though a majority of the moderator members of the modsquad had voted in favor of

8    "free, legal, and appropriate for all ages," not all online groups moved quickly to endorse the new

9    guideline. For example, the original etiquette for freecyclesunnyvale did not contain the direction

10    for members to keep it "free, legal, and appropriate for all ages." In June of 2004, that phrase was

11    added to freecyclesunnyvale's etiquette and emailed to all members for the first time on July 1,

12    2004. *Compare* Abraham Dec. ¶ 11 (original etiquette) *with* Oey Dec. ¶ 27 & Exh. G (revised

13    etiquette).

14          Despite the fact that a majority of the member moderators of the modsquad voted in favor

15    of "free, legal, and appropriate for all ages," Mr. Beal and TFN took a decidedly "hands off"

16    approach when it came to interpreting that phrase. *See* Abraham Dec. ¶¶ 22-23; Hedden Dec. ¶

17    13. In the months that followed the modsquad vote, discussions on the modsquad questioned

18    whether the following items were "appropriate for all ages": (1) firearms, (2) legal drugs (e.g.,

19    over the counter medications), (3) spanking paddles, (4) leather wrist straps, (5) services of an

20    artist, (6) syringes, (7) archery equipment, and (8) pets. *See* Abraham Dec. ¶¶ 24-25; Oey Dec. ¶¶

21    21, 23-26.

22          At the time of these discussions, neither Mr. Beal nor TFN indicated whether these items

23    were "appropriate for all ages." *See* Abraham Dec. ¶¶ 24-25; Oey Dec. ¶¶ 21, 23-26. Later, in a

24    modsquad discussion on February 27, 2004, Mr. Beal provided the interpretation that

25    "appropriate for all ages" means "no porn, alcohol, drugs, firearms or any fees, etc." *See*

26    Abraham Dec. ¶ 24 & Exh. K. Even later, by August 4, 2004, Mr. Beal had added tobacco to the

27    list. *See* Oey Dec. ¶ 26 & Exh. O. Other than these prohibited items, local moderators were left

28

on their own to decide what was "free, legal, and appropriate for all ages." *See* Hedden Dec. ¶ 6; Oey Dec. ¶ 20.

With respect to the operations of local online freecycling groups, Mr. Beal and TFN provided even less guidance. For example, when asked how to deal with spam messages, Mr. Beal suggested that a moderator wait until the group became big enough for spam to become a problem. Mr. Beal also suggested that local moderators turn to each other with questions. And, when one new moderator complained that she received no guidance after posting a question on the modsquad, Mr. Beal asked for understanding because people were busy. *See* Abraham Dec. ¶¶ 26-29; Hedden Dec. ¶¶ 2, 8-9; Oey Dec. ¶ 22.

During this time period, from March 2003 until September 2004, Mr. Beal and TFN did not monitor or supervise online freecycling groups. The online freecycling movement was growing, and new groups were being added to the list of approved groups on TFN's Web site. There is no evidence, however, that Mr. Beal or TFN monitored or supervised online groups that used the TFN Alleged Marks. *See also* Oey Dec. ¶¶ 29-30, 57; Robertson Dec. ¶¶ 7-8.

**F.    Starting In September 2004, TFN Mobilized Volunteer Groups, But None Of These Groups Monitored Or Supervised Online Freecycling Groups**

As the online freecycling movement continued to grow, Mr. Beal began organizing groups of volunteers to assist with various administrative tasks on behalf of TFN. None of these groups undertook the task of monitoring or supervising online freecycling groups that used the TFN Alleged Marks, including those groups that were listed as approved groups on TFN's Web site.

**1.    New Group Approvers checked new groups for administrative criteria, but did not monitor or supervise online freecycling**

In September 2004, Mr. Beal organized a group of volunteers known as New Group Approvers ("NGAs"). If an online freecycling group asked to be listed on TFN's Web site, an NGA would approve the group for listing. Initially, the approval process focused on whether the group posted certain files, such as an approved etiquette. Later, the approval process added a requirement that the new group must have the latest version of TFN's logo as well as TFN's trademark and copyright notice. Even later, the approval process required that groups must list

9

1    "Ersatzfriend" as a co-owner.  Ersatzfriend was a fictional person with an email address, created

2    by TFN for the stated purpose of providing an alternate owner of a group in case the original

3    owner or the moderators retired or were locked out of their groups.  Some believed that

4    Ersatzfriend was created for TFN to control of local freecycling groups through the privileges of

5    an online group owner.  On September 9, 2005, after the moderator members of the modsquad

6    voted against Ersatzfriend, TFN dropped the requirement.  *See* Hedden Dec. ¶¶ 14, 19-24; Oey

7    Dec. ¶¶ 31-33, 54 & Exh. GG, 66 & Exh. NN; Robertson Dec. ¶¶ 11, 13-14, 16, 18, 32.

8        There was an uneven practice among NGAs, who received minimal training and

9    supervision.  For example, at times, groups were approved even if those groups did not use TFN's

10   logo or post TFN's trademark and copyright notice.  At other times, groups were allowed to use

11   TFN's logo before they were approved.  Similarly, NGAs did not require new groups to list

12   Ersatzfriend as a co-owner before TFN added that requirement.  And, NGAs did not require new

13   groups to list Ersatzfriend as a co-owner after the requirement was dropped on September 9,

14   2005.  Even during the time that Ersatzfriend was required, one NGA effectively evaded the

15   Ersatzfriend requirement for his own online freecycling group.  *See* Oey ¶¶ 34, 56, 62 & Exh.

16   KK; Robertson Dec. ¶¶ 12, 17-18, 31.

17       NGAs did not require new groups to enter into a contract granting TFN rights to inspect or

18   supervise, and NGAs did not inspect or supervise online freecycling groups.  While NGAs did

19   inspect the Web sites of new groups to make sure that certain files were included, NGAs did not

20   follow up to make sure that those files were, in fact, kept or used.  NGAs did not inspect groups

21   that were previously listed on TFN's Web site.  NGAs did not inspect new groups after those

22   groups were approved and listed on TFN's Web site.  In fact, NGAs were forbidden from visiting

23   online freecycling groups to see if there were any problems.  Rather, NGAs interacted minimally

24   with new groups and, in so doing, approved groups whose owners were previously unknown to

25   the NGAs.  *See* Hedden Dec. ¶¶ 25-27; Oey Dec. ¶¶ 35-36, 56-57, 60-63; Robertson Dec. ¶¶ 13,

26   15, 20.

27

28

1

**2.    Group Outreach and Assistance responded to complaints, but did not monitor or supervise online freecycling**

2

3        Shortly after Mr. Beal organized the NGAs, and in approximately September 2004,

4    Mr. Beal organized a group of volunteers known as Group Outreach and Assistance ("GOAs").  If

5    a member of an online freecycling group had a complaint about a particular group, a GOA would

6    handle the complaint.  Not all complaints were investigated, however.  For example, one GOA

7    often waited until receiving two or three complaints about a particular group before investigating.

8    Even though GOAs were supposed to enforce TFN's "rules," not all rules were enforced.  Again,

9    one GOA often made judgment calls about pressing an issue if the owner of an online group

10   protested on the grounds that the group was locally owned and locally controlled.  In these

11   situations, the investigation of the complaint was often dropped, especially for seemingly minor

12   violations of TFN's "rules."  *See* Robertson Dec. ¶¶ 19, 21, 23-27.

13        GOAs took action, if at all, for flagrant violations of TFN's rules, such as repeated

14   postings of items for sale.  GOAs could remove a local group from the list of approved

15   freecycling groups on TFN's Web site.  GOAs also could report a group to a senior volunteer

16   who worked in the "back office" for TFN's Web site, who would initiate a request that Yahoo!

17   terminate the group.  Once the group no longer existed, TFN would then step in and start a new

18   group with its own volunteers as the owners and moderators.  *See* Robertson Dec. ¶¶ 28-30.

19        GOAs did not monitor or supervise online freecycling groups.  GOAs only responded to

20   complaints.  TFN expressly instructed GOAs not to visit or inspect groups before a complaint was

21   made.  In fact, Mr. Beal expressly told GOAs that he did not want to create the appearance that

22   TFN was monitoring local groups in any way.  *See* Oey Dec. ¶¶ 58 & Exh. HH, 60-63; Robertson

23   Dec. ¶ 21.

24

**3.    Interim Moderators stepped in to run a group if the moderators retired, but did not monitor or supervise online freecycling**

25

26        In January 2005, Mr. Beal announced to the modsquad that he organized a group of

27   volunteers known as the Interim Moderator Team ("I-Mods").  Initially, I-Mods were intended to

28   step in where a group was abandoned by its owners and moderators.  If Ersatzfriend was a co-

NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION
CASE NO. C06-00324 CW

1   owner of the abandoned group, TFN appointed an I-Mod to moderate the group.  If Ersatzfriend

2   was not a co-owner, TFN created a new group and asked the members of the abandoned group to

3   join the replacement group moderated by an I-Mods.  When local owners and moderators could

4   be found for the group, the I-Mod's job was done.  *See* Oey Dec. ¶ 59 & Exh. II.

5          In September of 2005, at the same time that TFN dropped the Ersatzfriend requirement,

6   the role of I-Mods was changed so that an I-Mod would own a replacement group for three

7   months and then promote a local moderator to co-owner.  I-Mods now stepped in as owners of

8   any replacement group, including ones created when a group was removed from TFN's Web site

9   or deleted altogether.  This effectively gave TFN control over the local groups for which an

10  I-Mod remained as an owner.  *See* Oey Dec. ¶ 66 & Exh. NN.

11         I-Mods did not monitor or supervise online freecycling groups.  Instead, I-Mods stepped

12  in to moderate replacement groups or groups that lost their owners and moderators.  After

13  September 2005, I-Mods remained as owners of replacement groups.  With respect to all other

14  online freecycling groups, I-Mods played no role at all.  *See* Oey Dec. ¶¶ 59, 60-63.

15              **4.    The Penguin Patrol educated online freecycling groups about TFN's**
                       **trademark policy and investigated TFN's critics, but did not monitor**
16                     **or supervise online freecycling**

17         In February of 2005, a group of volunteers known as the Penguin Patrol was created

18  primarily to introduce and implement TFN's trademark policy.  The duties included

19  (1) identifying and sending cease and desist notices to "rogue groups," that is, online freecycling

20  groups using the TFN Alleged Marks but that were not on TFN's approved list of groups,

21  (2) promoting TFN's trademark and copyright policy and encouraging local groups to adopt that

22  policy, (3) protecting TFN volunteers from "outing" by "particular baddies," and (4) "[g]eneral

23  sleuthing," that is, identifying and keeping tabs on individuals who were critical of TFN.

24  Because of the sensitive nature of Penguin Patrol activities, TFN requested members not to

25  discuss Penguin Patrol business outside of the group.[5]  *See* Oey Dec. ¶¶ 48-50 & Exh. DD.

---

[5]  TFN was the first to disclose and use the Penguin Patrol in litigation.  In a related action in
26  Arizona, TFN seeks damages from Timothy Oey and his wife for trademark infringement and
    unfair competition.  Mr. Oey is the leading member of FreecycleSunnyvale.  Mr. Oey also is a
27  former senior TFN volunteer and member of the Penguin Patrol.  TFN cited Mr. Oey's role in the
    Penguin Patrol in support of its argument that the Arizona court had personal jurisdiction over
28                                                                                    (cont'd)

1    The duties of members of the Penguin Patrol did not include monitoring and supervising

2    online freecycling groups.  The focus of the Penguin Patrol was on groups that were not listed on

3    TFN's Web site and on individuals who criticized TFN anonymously.  The Penguin Patrol had

4    nothing to do with online freecycling groups that were approved and listed on TFN's Web site.

5    *See* Oey Dec. ¶ 50.

6    **G.    TFN Does Not Have Possession, Custody, Or Control Of The Files Of Its
         Alleged Licensees**

7

8    In the course of this action, FreecycleSunnyvale served a discovery request for production

9    of documents that include the files of online freecycling groups that use the TFN Alleged Marks.

10   TFN effectively admitted that this request seeks documents that are relevant to several issues,

11   including the issue of whether TFN engaged in naked licensing.  *See* Declaration of Dennis S.

12   Corgill ¶¶ 2-4 ["Corgill Dec."].  Rather, on June 8, 2007, TFN objected, for the first time, that it

13   lacks possession, custody, or control of the files of many of the groups that TFN lists on its Web

14   site as approved groups.  Thus, TFN admits that, unless it is a co-owner, moderator, or member of

15   an affiliated online freecycling group, it lacks access to archived group files without the

16   permission of the group's owners or moderators.  *See* Corgill Dec. ¶ 5.

17   **IV.    LEGAL STANDARD**

18   Summary judgment should be granted when there is no genuine issue as to any material

19   fact because, viewing the evidence most favorably to the nonmoving party, the moving party is

20   entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317,

21   322-24 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).  "One of

22   the principal purposes of the summary judgment rule is to isolate and dispose of factually

23   unsupported claims or defenses . . . ."  *Celotex Corp.*, 477 U.S. 325 at 323-24.

24   Because a party asserting naked licensing has the ultimate burden of proof at trial, on

25   summary judgment that party must make a prima facie showing that would entitle it to prevail on

26   that issue.  *See Barcamerica Intern. v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002)

27   Mr. Oey.  *See* Order Granting Defendants' Motion to Stay, at p. 4, *The Freecycle Network, Inc. v.
     Tim Oey and Jane Doe Oey*, No. CV 06-173-TUC-RCC (D. Ariz. filed Apr. 4, 2006) (Docket #

28   64 entered June 20, 2006).

13

1    (party asserting naked licensing "faces a stringent standard of proof"; quotation omitted).  Once

2    the moving party has satisfied its initial burden, however, the nonmoving party must set forth

3    specific facts controverting the moving party's prima facie case; it "may not rest upon the mere

4    allegations or denials of the adverse party's pleading, but . . . must set forth *specific* facts showing

5    that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e) (emphasis added).  *See also Lujan v.*

6    *National Wildlife Federation*, 497 U.S. 871, 888 (1990); *Anderson v. Liberty Lobby*, 477 U.S.

7    242, 256 (1986).

8    **V.    ARGUMENT**

9         Even drawing all inferences in favor of TFN, FreecycleSunnyvale is entitled to summary

10   adjudication because there are no material facts which show or infer that TFN maintained quality

11   control over its alleged licensees' products or services.  All of TFN's counterclaims require TFN

12   to prove that it has trademark rights.  Trademark rights are an essential element of TFN's

13   counterclaims under 15 U.S.C. § 1125(a) for trademark infringement and unfair competition.  *See*

14   *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir.1987) (to prevail on

15   claim under § 43, plaintiff must show protectable trademark interest).  So too, TFN's

16   counterclaims under California Bus. & Prof. Code §§ 17200 *et seq*. require that TFN has

17   trademark rights.  *See Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir.1994) (stating that

18   the Ninth Circuit "has consistently held that state common law claims of unfair competition and

19   actions pursuant to California Business and Professions Code § 17200 are 'substantially

20   congruent' to claims made under the Lanham Act").  FreecycleSunnyvale is entitled to summary

21   adjudication because TFN abandoned any trademark rights through naked licensing.

22         It is black letter law that naked licensing forfeits trademark rights:  "[W]here a trademark

23   owner engages in naked licensing, without any control over the quality of goods produced by the

24   licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the

25   trademark by the licensor."  *Barcamerica Intern.*, 289 F.3d at 598 (emphasis in original;

26   quotation omitted).  *See also Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, 51 (9th Cir. 1971)

27   (trademark licensor "owes an affirmative duty to the public to assure that in the hands of [its]

28   licensee the trade-mark continues to represent that which it purports to represent").  *See also First*

14

*Interstate Bancorp v. Stenquist*, 1990 WL 300321, *3 (N.D. Cal. July 13, 1990) (naked licensing forbidden by 15 U.S.C. §§ 1055, 1127). *See generally* 3 McCarthy on Trademarks and Unfair Competition §§ 17:6, 18:42 (4th ed. 2007).

Courts look to three kinds of evidence to determine if an alleged trademark has been abandoned through naked licensing: whether the trademark owner (1) retained contractual rights to control quality, (2) actually controlled quality, or (3) reasonably relied on the licensee to maintain quality. *See Barcamerica Intern.*, 289 F.3d at 596 (courts uphold trademark where licensor familiar with licensee and relies on licensee quality control); *First Interstate*, 1990 WL 300321, *4 (first indication of quality control found in license agreement; actual licensor control accepted in absence of contractual right). Here, the facts show, not only a complete absence of quality control, but also an absence of quality standards.

**A.    TFN Did Not Establish Quality Standards**

For a trademark licensor to comply with its affirmative obligation to control the quality of its licensees' goods or services, *a fortiori* the trademark owner must establish quality standards. By any relevant measure, TFN does not have quality standards.

TFN's request that FreecycleSunnyvale not use TFN's logo for commercial purposes has nothing to do with quality control. As the Ninth Circuit explained, quoting Professor McCarthy,

> It is important to keep in mind that "quality control" does not necessarily mean that the licensed goods or services must be of "high" quality, but merely of equal quality, but merely of equal quality, whether that quality is high, low or middle. The point is that customers are entitled to assume that the nature and quality of goods and services sold under the mark at all licensed outlets will be consistent and predictable.

*Barcamerica Intern.*, 289 F.3d at 598 (emphasis omitted; quoting McCarthy on Trademarks and Unfair Competition § 18:55, at 18-94 (4th ed 2001)). The fact that a licensee operates not for profit says nothing about whether that licensee's freecycling services are of a given level of quality.

TFN's guideline that postings and items posted must be "free, legal, and appropriate for all ages" is not a quality control standard. First, the admonition that items must be "free" defines any freecycling service, but says nothing about the quality of freecycling services, only its

15

1   existence. Stating that freecycling is free is tantamount to stating that a hamburger stand sells

2   hamburgers. Second, the admonition that items must be "legal" restates a condition that applies

3   to any business. Stating that freecyclers may not exchange illegal items—such as heroin—is not

4   a quality standard regarding the way that freecyclers exchange lawful items or what lawful items

5   can be exchanged. "Legal" freecycling says nothing about the quality of lawful freecycling.

6   Third, the phrase "appropriate for all ages" is not a quality standard because TFN permits and

7   encourages local groups to decide, for themselves, what that phrase means. From syringes to

8   spanking paddles, and from pets to archery equipment, TFN's refusal to define what kinds of

9   items are "appropriate for all ages" precludes it from being a quality standard.

10          Nor can TFN argue that there is a quality standard in the way that its alleged licensees

11  operate their online freecycling groups. From March 2003 until September 2004, TFN did not

12  have a standard etiquette for online groups. From March 2003 until the spring of 2005, TFN did

13  not have an approved manual for group moderators. At one time, TFN required new groups to

14  list Ersatzfriend as a co-owner, but groups approved before September 2004, were exempt, and

15  even this putative requirement was dropped in September 2005. Throughout, TFN has

16  consistently avoided questions pertaining to the operation of local groups, such as questions about

17  spam, but instead asked local groups to seek guidance from modsquad discussions, which were

18  not always responsive to moderator questions.

19          As an alleged trademark owner with alleged licensees, TFN has an obligation to set

20  quality standards so that freecyclers know that the freecycling services offered by TFN's

21  approved groups are consistent and predictable. TFN failed to set quality standards for its alleged

22  licensees. For this reason alone, TFN abandoned its alleged trademarks through naked licensing,

23  and FreecycleSunnyvale is entitled to summary adjudication.

24      **B.**    **TFN Did Not Retain Contractual Rights To Inspect Or Supervise**

25          Even if TFN had quality standards—which TFN did not and does not—TFN must control

26  its alleged licensees to assure that those quality standards are met. Here, courts first look to

27  express license provisions to determine if the trademark licensor has contractual rights to inspect

28  or supervise. *See First Interstate*, 1990 WL 300321, *4 ("first indication that [licensor] did not

16

1    exercise sufficient quality control to protect its trademark is the lack of any controls or restrictions

2    in the agreement itself").

3        TFN did not enter into contracts with new online freecycling groups, much less contracts

4    that gave TFN rights to inspect or supervise. The closest that TFN came to a contractual right to

5    inspect or supervise was the Ersatzfriend requirement, which might have given TFN privileges to

6    inspect and supervise the activities of groups for which Ersatzfriend had sufficient rights. But,

7    the Ersatzfriend requirement never applied to all of TFN's approved groups, and TFN dropped

8    the requirement after a majority of modsquad members voted against it in September 2005.

9        TFN's so-called license with FreecycleSunnyvale demonstrates that TFN did not retain

10   any contractual rights to inspect or supervise. The only express provision is an admonition not to

11   "use it [the logo] for commercial purposes." Even if the prohibition of commercial purposes had

12   something to do with the quality of a licensee's services, TFN's alleged license falls short. The

13   purported contract does not define the services that FreecycleSunnyvale can offer or how it must

14   conduct its operations. The so-called contract does not even prevent FreecycleSunnyvale from

15   assigning its right to use any of the TFN Alleged Marks.

16       Indeed, TFN's purported license with FreecycleSunnyvale is far less detailed than license

17   found to be naked in *Halo Management, LLC v. Interland, Inc.*, 76 U.S.P.Q.2d 1199, 2004 WL

18   1781013 (N.D. Cal. Aug. 10, 2004). There, the license required the licensee, "one, 'to employ

19   reasonable efforts to maintain the positive business value of the HALO mark'; two, to limit mark

20   use to that 'substantially as shown in the pending applications and with services substantially as

21   recited'; and, three, to cooperate with HM to 'mitigate the confusion or likelihood of confusion

22   between the parties' respective marks'." *Id.* at *4. These contractual restrictions, which are far

23   more detailed than TFN's simple 'no commercial purposes' restriction, were deemed "inherently

24   amorphous" and "wholly undefined." *Id.* The Halo Management court found that license, by its

25   own terms, "a 'naked' one," *id.*, a conclusion that applies with even more force to all of TFN's

26   alleged licenses.

27

28

## C.  TFN Did Not Engage In Quality Control

"[W]here the courts have excused the absence of a contractual right of control, they have still required that the licensor demonstrate actual control through some sort of inspection or supervision." *First Interstate*, 1990 WL 300321, *4. *See generally* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 18:58-59 (4th ed. 2007).  But, TFN did not inspect or supervise its putative licensees.  Indeed, TFN took no interest whatsoever in the operations of its putative licensees until September 2004—a year and a half after TFN asserts priority to the TFN Alleged Marks—when Mr. Beal formed the NGA and GOA volunteer groups.

Even after TFN took an arguable interest in its alleged licensees' operations, TFN did not attempt to monitor or supervise all of the online freecycling groups that it approved and listed on its Web site.  TFN expressly told NGAs not to inspect already approved groups.  GOAs only responded to complaints about particular groups, and TFN expressly told GOAs not to inspect or visit groups unless a complaint was made.  The I-Mod volunteer group, which was formed in January 2005, moderated only replacement groups or groups that lost their owners and moderators.  Throughout, TFN and Mr. Beal did not want to create the appearance that TFN's volunteers were monitoring groups in any way.

In February of 2005, when TFN formed the Penguin Patrol, TFN began to take an interest in how its alleged licensees used the TFN Alleged Marks.  But, control of the use of a mark is not quality control of the goods or services distinguished by that mark.  Even if trademark use were relevant to quality control, TFN did not inspect trademark use until long after it asserts priority to the TFN Alleged Marks.  TFN simply did not maintain quality control in its actual relationships with its alleged licensees.

## D.  TFN Had No Basis To Rely On Licensee Control Of Quality

Some courts have permitted a trademark licensor to rely upon the licensee's own quality control, but only if "the licensor is familiar with and relies upon the licensee's own efforts to control quality" based on long-standing and close working relationships.  *Barcamerica Intern.*, 289 F.3d at 596-7 (reviewing cases in which prior associations lasted from eight to seventeen years).  *Accord, Transgro, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1018 (9th Cir.

1  1985) (court may consider whether licensor had long association with licensee and trusted

2  licensee to maintain quality). *See generally* 3 MCCARTHY ON TRADEMARKS AND UNFAIR

3  COMPETITION § 18:57 (4th ed. 2007). Here, however, there is no dispute that TFN was not

4  familiar with its alleged licensees' own quality control. Rather, TFN approved online freecycling

5  groups that were owned and moderated by total strangers without any quality control history.

6  FreecycleSunnyvale, for example, received a naked license a few days after Mr. Beal and Ms.

7  Abraham had a single telephone conversation and exchanged a few emails. TFN can hardly

8  claim that it was "familiar with and relie[d] upon [FreecycleSunnyvale's] own efforts to control

9  quality." FreecycleSunnyvale was a nascent group that lacked any quality control track record,

10  let alone one with which TFN was familiar.

11  Even after TFN formed the NGA volunteer group, TFN permitted unaffiliated freecycling

12  organizations to start operations that used the TFN Alleged Marks without prior notice to TFN.

13  TFN voiced no objection when those online groups would later affiliate with TFN's network.

14  When individuals would contact TFN for assistance before starting an online freecycling group,

15  TFN regularly allowed those groups to use the TFN Alleged Marks before those groups were

16  approved by an NGA. Just as Ms. Abraham was a total stranger to TFN when TFN granted

17  FreecycleSunnyvale a naked license, so too were the owners and moderators of numerous other

18  online freecycling groups. TFN had no reasonable basis to rely on any of these strangers to

19  perform any quality control.

20  **E.    TFN's Belated Trademark Enforcement Does Not Revive Any Trademark
       Rights That Were Forfeited Through Naked Licensing**

21

22  Once a trademark has been abandoned through naked licensing, that trademark cannot be

23  revived through belated efforts to inspect or supervise the quality of licensee operations. In *Halo*

24  *Management*, this Court rejected just such an attempt, stating that, "attempts to monitor [the

25  putative licensee's] use of the mark [beginning] more than six months after the license agreement

26  was entered . . . do not change the character of the 'naked' license . . . and they do not restore [the

27  putative licensor's] forfeited state or federal rights." 2004 WL 1781013, *6. In this case, at a

28  minimum, TFN engaged in naked licensing from TFN's inception in March 2003, until

19

1   September 2004. If the six month delay in *Halo Management* was inexcusable, the almost year

2   and a half delay in the instant case cannot revive TFN's forfeited rights.

3          Even if a year and a half delay were excusable, TFN's tardy efforts were categorically

4   inadequate. TFN never inspected or supervised all of its alleged licensees. Rather, TFN's belated

5   efforts initially focused NGA volunteers only upon new online groups that sought to affiliate with

6   TFN. Literally hundreds of existing groups continued to operate without any efforts by TFN to

7   control quality. Similarly, none of the GOA, I-Mod, and Penguin Patrol volunteers monitored

8   and supervised quality control over all of the approved freecycling groups that are listed on

9   TFN's Web site. Thus, TFN's naked licensing continued because volunteers inspected groups

10  only when new groups were approved or a complaint was received about an existing group. A

11  non-profit organization with only a single full-time employee cannot somehow ensure quality

12  control over the thousands of online groups that are listed on TFN's Web site.

13  **F.    TFN Cannot Revive Its Alleged Trademarks Because TFN's Naked Licensing Continues**

14

15         No precedent supports restoring a putative trademark abandoned through naked licensing,

16  much less one for which naked licensing continues unabated. TFN has refused to produce the

17  archived files of many of its alleged licensees on the groups that it lacks the possession, custody

18  or control required by FED.R.CIV.P. 34(a). TFN cannot argue, on the one hand, that it monitors

19  and supervises its alleged licensees' online freecycling activities while simultaneously asserting

20  that it lacks possession, custody or control of the relevant documents. TFN's conceded lack of a

21  legal right to the electronic files that show how its alleged licensees engage in online freecycling

22  inherently concedes that it lacks the ability to inspect, monitor or supervise its alleged licensees'

23  activities.

24         Even if TFN at some point had trademark rights—which TFN did not—TFN abandoned

25  any alleged rights through naked licensing to FreecycleSunnyvale and countless others. As an

26  alleged trademark owner, TFN has an obligation to maintain quality standards, but TFN has no

27  quality standards to maintain. Finally, TFN has never maintained contractual rights to inspect

28  and supervise, has never actually monitored and supervised its putative licensees, and never could

20

1  reasonably rely upon strangers to control quality.  Each of these failures, standing alone, would

2  preclude any reasonable jury from finding that TFN has a protectable trademark interest.  Taken

3  together, there can be no legitimate question that they mandate summary adjudication.  *See*

4  *Barcamerica*, 289 F.3d at 598 (affirming summary judgment dismissing licensor's trademark

5  claims where licensor abandoned mark through naked licensing); *First Interstate*, 1990 WL

6  300321, *5 (partial summary judgment of trademark based counterclaims due to naked licensing).

7  **G.    TFN's Lack Of Enforceable Trademark Rights Requires Summary**
   **Adjudication On Its Trademark-Related Counterclaims**

8

9        As set forth above, TFN's counterclaims are not premised on a valid trademark.

10  Accordingly, TFN cannot establish an essential element of its federal trademark infringement and

11  unfair competition counterclaims.  *See* 15 U.S.C. §§ 1114, 1125(a) (requiring valid trademark as

12  element of federal trademark and unfair competition claim).

13        "The standard for Lanham Act unfair competition is the same as that for Lanham Act

14  trademark infringement."  *Glow Indus. v. Lopez*, 252 F. Supp. 2d 962, 975 n.90 (C.D. Cal. 2002).

15  *Accord, Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036,

16  1046-47 (9th Cir. 1999) (both trademark infringement and unfair competition under the Lanham

17  Act require establishing that the defendant is using a mark confusingly similar to a valid,

18  protectable trademark of the plaintiff).  Similarly, because "state common law claims of unfair

19  competition and actions pursuant to California Business and Professions Code § 17200 are

20  'substantially congruent' to claims made under the Lanham Act," TFN's lack of a protectable

21  trademark interest dooms its state law counterclaims as well.  *Cleary v. News Corp.*, 30 F.3d

22  1255, 1262-63 (9th Cir. 1994).  *Accord, Mallard Creek Industries, Inc. v. Morgan*, 56

23  Cal.App.4th 426, 434, 65 Cal.Rptr.2d 461, 466-67 (1997) (analysis for state law trademark

24  infringement is the same as under federal law).  Therefore, FreecycleSunnyvale is entitled to

25  summary adjudication on all of TFN's trademark-related counterclaims.

26        Because TFN lacks a protectable trademark interest, it cannot prevail on any federal or

27  state counterclaim for trademark infringement or unfair competition.  Accordingly,

28

NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION
CASE NO. C06-00324 CW

1  FreecycleSunnyvale is entitled to summary adjudication on its request for a declaration of non-

2  infringement.

3  **VI.    <u>CONCLUSION</u>**

4          The undisputed facts conclusively establish that even if TFN ever had any protectable

5  interest in the TFN Alleged Marks, it abandoned those marks by engaging in naked licensing.

6  Even if any precedent supported allowing a trademark owner to regain marks lost to naked

7  licensing, TFN's continued practices, and its inability or refusal to monitor or supervise its

8  putative licensees, would prevent any reasonable jury from finding in its favor at trial.

9          Accordingly, Plaintiff and Counterdefendant FreecycleSunnyvale respectfully requests

10  that this Court grant summary adjudication in favor of FreecycleSunnyvale and against Defendant

11  and Counterclaimant The Freecycle Network, Inc., on (1) FreecycleSunnyvale's request for a

12  declaration of non-infringement and, in the alternatives, that the TFN Alleged Marks are generic

13  or that The Freecycle Network, Inc., engaged in naked licensing, and (2) The Freecycle Network,

14  Inc.'s counterclaims for trademark infringement and unfair competition.

15  Dated: July 17, 2007

16                                                  MAYER, BROWN, ROWE & MAW LLP

17

18                                                  By: _____
                                                         Dennis S. Corgill
19                                                       Attorneys for Plaintiff
                                                         FREECYCLESUNNYVALE,
20

21

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION FOR SUMMARY ADJUDICATION
CASE NO. C06-00324 CW