PAUL J. ANDRE, Bar No. 196585
(pandre@perkinscoie.com)
LISA KOBIALKA, Bar No. 191404
(lkobialka@perkinscoie.com)
ESHA BANDYOPADHYAY, Bar. No. 212249
(ebandyopadhyay@perkinscoie.com)
SEAN M. BOYLE, Bar No. 238128
(sboyle@perkinscoie.com)
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, CA 94025
Telephone:     (650) 838-4300
Facsimile:     (650) 838-4350

Attorneys for Defendant
The Freecycle Network, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| FREECYCLESUNNYVALE,<br>a California unincorporated association,<br><br>       Plaintiff,<br><br>   v.<br><br>THE FREECYCLE NETWORK, INC.,<br>an Arizona corporation,<br><br>      Defendant. | CASE NO. C 06-00324 CW<br><br>**THE FREECYCLE NETWORK, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION UNDER FED.R.CIV.P. 56** |
| THE FREECYCLE NETWORK, INC.<br>an Arizona corporation,<br><br>      Counterclaimant,<br><br>   v.<br><br>FREECYLESUNNYVALE,<br>a California unincorporated association,<br><br>      Counterdefendant, | Date:       September 27, 2007<br>Time:       2:00 p.m.<br>Before:     Honorable Claudia Wilken<br>Location:    Courtroom 2 |

THE FREECYCLE NETWORK, INC.'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY ADJUDICATION UNDER FED.R.CIV.P. 56

CASE NO. C 06-00324 CW

Dockets.Justia.com

**TABLE OF CONTENTS**

<u>Page</u>

I.    INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ........................................................................... 3

    A.    The Freecycle Network's Mission and Ethos ................................... 3

    B.    The FREECYCLE Mark, THE FREECYCLE NETWORK Mark and The Freecycle Network's Logo .................................................. 4

    C.    The Freecycle Network's Copyright and Trademark Policy ............ 5

    D.    The Freecycle Network's Strict Requirements for Approval............ 6

    E.    The Freecycle Network's Rules & Etiquette.................................... 7

    F.    Monitoring Mechanisms ................................................................. 9

III.    LEGAL STANDARD ................................................................................ 10

    A.    Motions for Summary Judgment ................................................... 10

IV.    ARGUMENT ........................................................................................... 10

    A.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network Established Quality Control Standards to Ensure a Consistent User Experience For All Members of The Freecycle Network's Affiliated Groups ................................................................................................ 10

        1.    "Free, Legal, and Appropriate for All Ages" ...................... 12

        2.    Other Quality Standards ..................................................... 12

        3.    Yahoo! Groups Terms and Conditions................................. 13

        4.    The Freecycle Ethos ........................................................... 13

    B.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network Retains an Implied Contractual Right to Inspect and Supervise Member Groups ............................................................................... 14

    C.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network Engages in Actual Quality Control That Prevents Deception of the Public............................................................................................ 16

        1.    The Freecycle Network's Actual Quality Controls Are More Than Sufficient Given the Minimal Quality Controls Required for Simple Services Like The Freecycle Network's ................. 16

THE FREECYCLE NETWORK, INC.'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY ADJUDICATION UNDER FED.R.CIV.P. 56

CASE NO. C 06-00324 CW

2.    The Freecycle Network's Actual Quality Controls Are More Than Sufficient To Prevent Deception of the Public Given the Public's Expectations ........................................................................ 19

3.    The Freecycle Network Exercised Sufficient Quality Standards and Controls and thus, Precludes a Finding of Naked Licensing........ 19

D.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network's Quality Control Efforts Were Belated............................................ 22

E.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network Currently Engages In Quality Controls .............................................. 24

F.    Summary Judgment Should Be Denied Because Even if The Freecycle Network Engaged in Naked Licensing, It Has At the Very Least Recaptured Its Rights in the Marks .................................................................. 24

V.    CONCLUSION ........................................................................................................ 25

1

# TABLE OF AUTHORITIES

2
**Page**

3
## CASES

4
Adickes v. S.H. Kress & Co.,
5
   398 U.S. 144 (1970) ........................................................................................ 10

6
Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986) ........................................................................................ 10

7
Arner v. Sharper Image Corp.,
8
   39 U.S.P.Q.2d 1282 (C.D. Cal. 1995) ............................................................ 11

9
Arthur Murray, Inc. v. Horst,
   110 F. Supp. 678 (D. Mass. 1953) .................................................................. 19
10

11
Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.,
   289 F.3d 589 (9th Cir. 2002) ............................................. 11, 14, 16, 17, 19

12
Birthright v. Birthright Inc.,
13
   29 U.S.P.Q.2d 1081 (D.N.J. 1993) ............................................................ 14, 15

14
Dawn Donut Co. v. Hart's Food Stores, Inc.,
   267 F.2d 358 (2d Cir. 1959) ........................................................................ 10, 16
15

16
First Interstate Bancorp v. Stenquist,
   16 U.S.P.Q.2d 1704 (N.D. Cal. 1990) ............................................................ 16

17
Halo Management, LLC v. Interland, Inc.,
18
   2004 WL 1781013 (N.D. Cal. Aug. 10, 2004) .......................................... 22, 23

19
Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,
   549 F.2d 368 (5th Cir. 1977) .......................................................................... 18
20

21
KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.,
   408 F.3d 596 (9th Cir. 2005) .......................................................................... 10

22
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
23
   475 U.S. 574 (1986) ........................................................................................ 10

24
Transgo, Inc. v. Ajac Transmission Parts Corp.,
   768 F.2d 1001 (9th Cir. 1985) ........................................................................ 11
25

26
Warren v. City of Carlsbad,
   58 F.3d 439 (9th Cir. 1995) ............................................................................ 10

27
## RULES

28
Fed. R. Civ. P. 34(a) .............................................................................................. 24

# I.    INTRODUCTION

As a preliminary matter, Plaintiff and Counterdefendant FreecycleSunnyvale ("Plaintiff") should be denied summary adjudication at this time simply because discovery in this case has not yet been completed, despite Plaintiff's blatant misrepresentation to the contrary before the Court. As discussed in The Freecycle Network's Motion to Strike, Plaintiff failed to provide The Freecycle Network with an adequate opportunity to take the deposition of Miles Dennis Robertson, Jr., or to conduct expert discovery. Dkt. No. 101. Furthermore, just days ago, on August 31, 2007, it produced an additional *60,000* documents to The Freecycle Network. Declaration of Lisa Kobialka in Support of The Freecycle Network's Opposition to FreecycleSunnyvale's Motion for Summary Adjudication ("Kobialka Decl."), ¶ 112, Ex. 110. Moreover, the expert consulting with The Freecycle Network that was prepared to provide a report on this issue during the Court-approved schedule that was mutually agreed upon by the parties was unavailable on such short notice to provide a declaration in support of the present opposition. Id., ¶ 2. Plaintiff therefore has rashly and inappropriately imposed the burden of summary judgment briefing upon the Court, even while still actively engaged in discovery. Plaintiff's late production also sandbags The Freecycle Network with the impossible task of reviewing all of the documents within a period of days before filing its opposition to Plaintiff's motion for summary adjudication. Such disregard of proper procedure and misrepresentation to the Court cannot be condoned, and The Freecycle Network as such respectfully requests the Court to deny Plaintiff's Motion for Summary Judgment or, in the Alternative, Summary Adjudication, on FreecycleSunnyvale's First Claim for Relief and The Freecycle Network's Counterclaims ("MSJ").

Plaintiff attempts to stylize its MSJ as a simple discrete issue that would resolve the trademark-based claims and counterclaims. However, Plaintiff cannot simply overcome the stringent standard of proof for showing that The Freecycle Network has engaged in naked licensing, thereby forcing an involuntary forfeiture of the Freecycle Network's trademark rights. Indeed, Plaintiff cannot show that The Freecycle Network engaged in naked licensing as genuine

1    issues of material fact exist such that The Freecycle Network can demonstrate that it established

2    quality control standards and exercised actual quality control.[1]

3         Plaintiff attempts to argue that since there was no central authoritarian leadership to

4    create and enforce quality standards and controls, The Freecycle Network could not have policed

5    and monitored its member groups.  However, since its inception, The Freecycle Network has

6    built upon its Mission and Ethos, which not only coordinates the reuse, recycling, and re-gifting

7    services, but also defines the types of participation and interactions that occur within its groups.

8    The Freecycle Network instituted clear rules and standards, including specific trademark

9    policies, by which its member groups must abide, including the most important rule that goods

10   that members post must be "free, legal, and appropriate for all ages."  As a small, grassroots

11   organization, Deron Beal, the founder of The Freecycle Network, initially monitored the quality

12   controls and standards.  However, as The Freecycle Network quickly expanded, it outgrew these

13   informal quality controls and The Freecycle Network formed new, more formalized

14   mechanisms.  The Freecycle Network has maintained a consistent experience among its users by

15   implementing posting standards, pick-up procedures, approval requirements, and setting out an

16   appropriate etiquette by which member groups must comply.  The Freecycle Network operates

17   under a structure of authority in which moderators, New Group Approvers, Group Outreach

18   Assistants, Interim Moderators, and the Penguin Patrol monitor and control the FREECYCLE

19   name and service.  Moreover, consistent with its grassroots origins, The Freecycle Network

20   continues to operate as a decentralized, democratic leadership that allows regional member

21

22

23

24         [1] Plaintiff continues to improperly use the term FREECYCLE in a generic manner
     throughout its Motion to induce the Court into construing the term as generic and thus, not
25   entitled to protection.  The primary significance of the term is to describe The Freecycle
     Network and not just the type of service The Freecycle Network provides.  FREECYCLE is
26   used or understood by consumers and members as indicating the source or the umbrella
     organization under which the service is the re-using, recycling, and gifting of goods.  As such,
27   any such usage by Plaintiff in its Motion to persuade the Court that the term is generic is
     inappropriate and offensive.  This, moreover, as Plaintiff admits, is not at issue in this motion
28   and therefore, is not addressed substantively herein.

1  groups, through the structure of authority, to adapt The Freecycle Network's rules and
2  procedures to the particular needs of their communities.

3      Plaintiff cannot meet the high burden necessary to obtain the extraordinary relief of
4  forcibly taking away all of The Freecycle Network's trademark rights by showing a naked
5  license on summary judgment.  In particular, genuine issues of material fact exist as to whether
6  The Freecycle Network established quality standards, retained the right to inspect or supervise,
7  engaged in or currently engages in quality control, and to the extent it is an issue, has since
8  recaptured its rights in the Marks.  As a result, The Freecycle Network respectfully requests that
9  the Court deny Plaintiff's MSJ.

10                     **II.      STATEMENT OF FACTS**

11  **A.      The Freecycle Network's Mission and Ethos**

12      The Freecycle Network is an umbrella nonprofit Arizona corporation with member
13  groups throughout the world dedicated to encouraging and coordinating the reuse, recycling, and
14  gifting of goods throughout the United States and other countries.  Declaration of Deron Beal in
15  Support of The Freecycle Network's Opposition to FreecycleSunnyvale's Motion for Summary
16  Adjudication ("Beal Decl."), ¶ 2; Kobialka Decl, ¶ 3, Exh. 1.  The non-profit organization
17  started in Tuscon, Arizona in May, 2003, with a single recycling center.  Id.  Today, The
18  Freecycle Network is a worldwide organization, with thousands of local recycling groups and
19  more than an estimated two million individual members.  Id.

20      The Freecycle Network's "mission is to build a worldwide gifting movement that
21  reduces waste, saves precious resources & eases the burden on our landfills while enabling our
22  members to benefit from the strength of a larger community."  Beal Decl., ¶ 2; Kobialka Decl.,
23  ¶4, Ex. 2.  To support this mission, The Freecycle Network maintains an Internet web site,
24  located at www.freecycle.org, with a directory of local Freecycle affiliated groups throughout
25  the world and provides resources for volunteers to create new Freecycle groups.  Beal Decl., ¶ 3.

26      The Freecycle Network does more than simply coordinate reuse, recycling, and gifting
27  efforts by its members.  Since its inception, The Freecycle Network has cultivated and
28  maintained a "Freecycle Ethos" among Freecycle groups that defines the types of interactions

that occur within its group and the types of people that participate in its groups. Kobialka Decl.,

¶¶ 6-8, Exhs. 4-6; Beal Decl., ¶ 9. The Freecycle Ethos involves cultivating a positive, "warm-

fuzzy" environment in which individuals are encouraged to act selflessly by giving to others

without personal gain. Id. As Deron Beal, the founder of The Freecycle Network describes it:

> It's the beauty of the beast called Freecycle. It is intrinsically good and draws on the good aspect of each person – the grumpy old guy is tickled to get rid of his junk, the nonprofit gets what they [sic] need, every individual giver experiences the fun of helping someone else out in a big way with absolutely no sweat off their [sic] back. And, we all get to get in a completely guilt-free and warm-fuzzy way.

Kobialka Decl., ¶ 9, Exh. 7. Part of the Freecycle Ethos includes decentralized, democratic

leadership that allows regional groups to adapt their rules and procedures to the particular needs

of their communities. Kobialka Decl., ¶¶ 5, 10-13, Exhs. 3, 8-11; Beal Decl., ¶ 9. This Ethos,

however, is specifically for members of The Freecycle Network. See id. Rather than dictatorial

leadership from Mr. Beal, The Freecycle Network's decisions are made through the use of

surveys and discussions between group moderators. Id. This "Freecycle Ethos" of "warm-

fuzzy" feelings and democracy is an essential quality of the groups that The Freecycle Network

has carefully regulated by putting in place rules and mechanisms for enforcing those rules. Id.;

Kobialka Decl., ¶¶ 14-16, Exhs. 12-14.

**B.      The FREECYCLE Mark, THE FREECYCLE NETWORK Mark and The Freecycle Network's Logo**

The public has come to associate the Freecycle Ethos with The Freecycle Network's

name and marks. The Freecycle Network has been using the trademarks FREECYCLE, THE

FREECYCLE NETWORK, and the distinctive FREECYCLE logo (collectively "The Freecycle

Network's Marks" or "the Marks") exclusively and continuously since at least May 1, 2003 as a

service mark to identify its re-using, recycling, and gifting services. Beal Decl., ¶ 4, Exh. 1;

Kobialka Decl., ¶ 17, Exh. 15. As a result of its use and promotion of The Freecycle Network's

Marks, The Freecycle Network has built up and now owns valuable goodwill that is symbolized

by these trademarks. Kobialka Decl., ¶¶ 3, 18-19, Exhs. 1, 16-17. Furthermore, The Freecycle

Network's Marks comprise the core of The Freecycle Network's intellectual property. Id.

Federal registration of The Freecycle Network's Marks is pending before the United States

1  Patent and Trademark Office.  Id.; Beal Decl., ¶ 5, Exhs. 2-3.  In addition, The Freecycle

2  Network's Marks have received registration in foreign countries.  Id.

3       The Freecycle Network gives its local groups permission to use The Freecycle Network's

4  Marks for local promotions.  Id., ¶ 6.  The Freecycle Network's Marks are used to identify local

5  recycling organizations which participate with The Freecycle Network organization.  Id.;

6  Kobialka Decl., ¶ 20, Exh. 18.  The Freecycle Network's Marks are further used by The

7  Freecycle Network to promote recycling of usable items within a community.  Beal Decl., ¶ 6;

8  Kobialka Decl., Ex. 19.  Individual recyclers rely on the Marks to know that they are dealing

9  with a local organization officially affiliated with The Freecycle Network.  Beal Decl., ¶ 7;

10  Kobialka Decl., ¶¶ 20, 22-27, 104-06, Exhs. 18, 20-25, 102-04.  The member groups frequently

11  modify the Marks by adding a word or phrase, and often identifying a geographic location, that

12  further identifies the member group.  For example, a member group is named

13  "FreecycleSanFrancisco" to signify that the member group is located in San Francisco,

14  California.  However, these modified marks share the same core, i.e. the word "freecycle," and

15  are therefore substantially the same.  Kobialka Decl., ¶ 29, Exh. 27.

16  **C.     The Freecycle Network's Copyright and Trademark Policy**

17       In early 2004, The Freecycle Network created an intellectual property working group

18  tasked with developing guidelines for protecting The Freecycle Network's intellectual property,

19  including The Freecycle Network's Marks.  Beal Decl., ¶ 25, Exh. 44.  Tim Oey, a co-owner of

20  FreecycleSunnyvale, was an active member of The Freecycle Network from early 2004 until late

21  2005.  Id.  He vigorously defended The Freecycle Network's rights to The Freecycle Network's

22  Marks in public email exchanges and various Internet fora while he was a member of The

23  Freecycle Network.  Id.  For example, in an e-mail dated September 17, 2004, Oey stated, in

24  pertinent part, "Everyone in the Freecycle network needs to protect the "Freecycle" trademark."

25  Id.  Additionally, he prepared trademark protection guidelines to further preserve The Freecycle

26  Network's Marks.  Id.  The Freecycle Network requires each and every one of its members to

27  abide by The Freecycle Network Trademark policy.  Id., ¶ 26.  Member groups that fail to

28  properly use both the FREECYCLE trademark and logo are initially sent cease and desist letters.

1    Id.  The Freecycle Network will only request Yahoo! Groups to remove members that continue

2    to violate the Trademark policy.  Id.

3    **D.     The Freecycle Network's Strict Requirements for Approval**

4           The Freecycle Network instituted clear guidelines since its inception and required

5    members to abide by them.  Beal Decl., ¶ 20.  Since October 2003, Mr. Beal and other

6    moderators have recruited individuals to create and join a member group as part of The

7    Freecycle Network.  *See* id., ¶¶ 27, 30.  The existing moderators instructed new members to join

8    Yahoo! groups and provided The Freecycle Network's approved etiquette to new member

9    groups, which was listed on The Freecycle Network's web site.  Id.  As the number of member

10   groups increased throughout the country and the world, The Freecycle Network created a more

11   detailed sign-up procedure and guidelines for how potential members would be allowed to join

12   The Freecycle Network.  Id., ¶ 20; Kobialka Decl., ¶¶ 28-29, Exhs. 26-27.  In a rapid, but

13   structured process, committees comprised of participating moderators established policies and

14   modified them through extensive discussion to prevent overlapping and duplicate groups.  Beal

15   Decl., ¶ 20; Kobialka Decl., ¶¶ 20, 28, Exhs. 18, 26.  To maximize its efficiency and to minimize

16   confusion, The Freecycle Network created guidelines regarding the number and organization of

17   member groups.  Beal Decl., ¶ 20; Kobialka Decl., ¶¶ 5, 22, 27, Exhs. 3, 20, 25.  New groups

18   must also comply with The Freecycle Network's geographic guidelines.  Kobialka Decl., ¶¶ 20,

19   30, 32, Exhs. 18, 28, 30.  The Freecycle Network implements "smallest viable size" groups in

20   order to allow as many groups as possible in a community.  Id., ¶ 33, Exh. 31.  It is also

21   consistent with The Freecycle Network's environmental goals by reducing driving time and the

22   use of fossil fuels.  Id., ¶¶ 21, 34, Exhs. 19, 32.  The Freecycle Network imposes these standards

23   on approximately 10,000-30,000 members per town or area.  Id., ¶ 33, Exh. 31.  The guidelines

24   also discourage regional groups or larger county groups as unnecessary overlap might occur

25   when smaller communities form separate groups.  Id., ¶¶ 20-21, 107, Exhs. 18-19, 105.  When a

26   potential overlap occurs between a new group and an existing group, The Freecycle Network's

27   policy is to defer to the existing group owner to decide if the area should be split into two or

28   three groups.  Id., ¶¶ 21, 36, 107, Exhs. 19, 34, 105.  The committees also created guidelines for

1    use of the mark FREECYCLE, and The Freecycle Network name and logo for existing

2    registered groups.  Id., ¶¶ 28, 30-31, Exhs. 26, 28-29.  Existing groups unwilling or unable to

3    abide by the guidelines could no longer use these Marks.  Id., ¶ 30, Exh. 28.

4         Finally, The Freecycle Network also mandates the "one group per owner" rule and

5    requires the owner to actually live in the area.  Id., ¶¶ 37-39, Exhs. 35-37.  These rules promote

6    the community concept engendered by The Freecycle Network's goals.  Id.  Local owners have

7    the ability to know and rely on their local recycling contacts.  Id.  In addition, a local owner will

8    be able to better plan a local café meet up and coordinate local events.  Id.

9    **E.      The Freecycle Network's Rules & Etiquette**

10        To ensure that member groups stay true to The Freecycle Network's mission and Ethos,

11   and that members will have consistent user experiences, The Freecycle Network maintains a

12   long list of rules and policies by which groups and members must abide.  Id., ¶¶ 16, 40-48, 64,

13   108, Exhs. 14, 38-46, 62, 106  These rules govern the procedures for offering, requesting, and

14   accepting goods, the types of goods that can be gifted, and the content of acceptable messages.

15   Id., ¶¶ 40, 42-44, 47-48, 61, Exhs. 38, 40-42, 45-46, 59.  Local group moderators must enforce

16   these rules among their members.  Id., ¶¶ 16, 45, 50-51, Exhs. 14, 43, 48, 49.  For minor

17   infractions, The Freecycle Network institutes a "two strikes and you're out" rule, but for gross

18   misconduct, such as sending spam messages, a much harsher "one strike and you're out" rule is

19   enforced.  Id., ¶¶ 29, 42, 44, Exhs. 27, 40, 42.

20        Chief among its rules, The Freecycle Network requires all members and groups to keep

21   the contents of their postings and the goods that they post "free, legal, and appropriate for all

22   ages."  Id., ¶¶ 10, 16, 27, 40, 44, 52-56, Exhs. 8, 14, 25, 38, 42, 50-54.  Shortly after its

23   inception, The Freecycle Network mandated this phrase after a vote in January 2004 among the

24   moderators.  Beal Decl., ¶ 10; see Declaration of Lisanne Abrahams in Support of

25   FreecycleSunnyvale's Motion for Summary Adjudication ("Abraham Decl.") (Dkt. No. 72), ¶¶

26   21-22, Exhs. H-I.  It was overwhelmingly approved, as the requirement is critical to defining and

27   maintaining the Freecycle Ethos.  Beal Decl., ¶ 10.  The "free" requirement not only prohibits

28   members from posting items for sale, but also items for trade, advertisements for yard sales, or

1   any other offer that comes "with strings attached." Kobialka Decl., ¶¶ 41, 45, 50, 55, Exhs. 39,

2   43, 48, 53. As Mr. Beal himself described it, the goal of The Freecycle Network is "to gift

3   without any expectation of personal benefit or sales," and the "free" requirement embodies that

4   goal. Id., ¶ 57, Ex. 55. The "legal" requirement prevents Freecycle groups from becoming a

5   source of illegal goods that could threaten its groups with legal liability and alter the "family

6   friendly" nature of The Freecycle Network. Id., ¶¶ 10, 52, 58-59, Exhs. 8, 50, 56-57. The

7   "appropriate for all ages" requirement further reinforces the family friendly nature of The

8   Freecycle Network, ensuring that anyone, regardless of age, can participate in its gifting services

9   without fear of exposure to inappropriate content. Id., ¶¶ 43, 59-60, Exhs. 41, 57-58.

10         The Freecycle Network defined "appropriate for all ages" as excluding, at a minimum

11  "weapons, alcohol, tobacco, drugs of any kind, porn, etc." Id., ¶¶ 53, 59-60, Exhs. 51, 58-59.

12  However, as a global network of groups from vastly different communities with vastly different

13  standards, The Freecycle Network recognized that no single "appropriate for all ages" standard

14  could suffice. Id., ¶ 10, Exh. 8. Instead, The Freecycle Network empowered its local

15  moderators to exercise judgment and apply local community standards. Id., ¶¶ 10-13, 62, Exhs.

16  8-11, 60. Thus, while groups would generally agree on what items were considered "appropriate

17  for all ages," some items banned in one group would be allowed in others. Id., ¶¶ 10-13, 51, 63,

18  Exhs. 8-11, 49, 61. This decentralized aspect of The Freecycle Network's rules was a feature,

19  though, not a flaw.

20         In addition to the baseline "free, legal, and appropriate for all ages" rule, The Freecycle

21  Network has been enforcing a host of other rules and policies that further define and maintain

22  the consistent look and feel of Freecycle branded groups. Id., ¶¶ 35, 40, 42, 44, 48, 50, 55, 57,

23  64, Exhs. 33, 38, 40, 42, 46, 48, 53, 55, 62. These rules were compiled and posted on the

24  ModSquad mailing list and made available to moderators. Id., ¶¶ 48, 50, 55, 57, Exhs. 46, 48,

25  53, 55. Among these rules and policies were the following restrictions on member activities:

26  • Curbside offers: Members were prohibited from posting messages indicating that they
       would leave an item on their curb for anyone to pick up. This was in part to prevent the
27     waste of gasoline as people drive to pick up an item that might already have been taken,
       and in part to protect the safety of members. Id., ¶ 40, Exh. 38.
28

- Posting procedures: The Freecycle Network defined the format in which members should offer or request goods. The subject line of postings had to either begin with "OFFER" or "WANTED" and include the item and location. All responses had to be directed only to the person who posted initially, not to the entire group. Once a posting was fulfilled, the original poster had to post a "TAKEN" or "RECEIVED" posting. The Freecycle Network also limited reposts of the same item to once every two weeks to prevent members from flooding the group with redundant requests. Id., ¶¶ 43-44, 48, Exhs. 41, 42, 46.

- On topic and courteous: The Freecycle Network required postings by members to be both on topic and courteous, punishing those who were rude or who personally attacked other members. Id., ¶¶ 43-44, Exhs. 41-42. The Freecycle Network prohibited political, religious, or any other non-gift-offering discussions from its groups.

- No First Come First Served: The Freecycle Network prohibited groups from instituting "first-come first-served" rules because they were prone to abuse by "post stalkers and resellers." Id., ¶ 65, Exh. 63.

- No Dictatorships: The Freecycle Network also encouraged its moderators not to act as dictators, since dictatorships were antithetical to the Freecycle Ethos. Moderators were told to "always be nice and light to the group, even if you are publicly giving one guy a strike so all learn not to do something." Id., ¶¶ 9, 13, 51, Exhs. 7, 11, 49.

These are just some examples among the many policies The Freecycle Network enforces to maintain the Freecycle Ethos among its groups. Id., ¶¶ 16, 40, 42-44, 46, 66, 94, Exhs. 14, 38, 40-42, 44, 64, 92.

## F.    Monitoring Mechanisms

Each local group, run by one or more local moderators and owners, must apply to effectively join The Freecycle Network. Beal Decl., ¶ 8, Exhs. 4-6; Kobialka Decl., ¶¶ 29, 97, Exhs. 27, 95. To be approved, each member must abide by The Freecycle Network's rules, including the Freecycle Etiquette and Trademark policy. Beal Decl., ¶ 8, Exhs. 4-6; Kobialka Decl., ¶¶ 29, 60, Exhs. 27, 58. Each member group is moderated by local volunteers who are required to unsubscribe members who do not comply with The Freecycle Network's rules. Beal Decl., ¶ 8, Exhs. 4-6; Kobialka Decl., ¶¶ 22, 32, 60, Exhs. 20, 30, 58. In return, the group is listed on the central The Freecycle Network registry. Beal Decl., ¶ 8, Exhs. 4-6; Kobialka Decl., ¶¶ 22, 32, Exhs. 20, 30. All member groups must utilize Yahoo! Groups, and can be removed from not only The Freecycle Network central registry, but can be removed from the Yahoo!

1   Groups for violations of Trademark policy.  Beal Decl., ¶ 8, Exhs. 4-6; Kobialka Decl., ¶¶ 29,

2   68-70, Exhs. 27, 66-68.

3       In addition, The Freecycle Network instituted mechanisms to monitor and supervise its

4   Ethos, Rules, Etiquette, and the Marks.  Beal Decl., ¶¶ 12-19, Exhs. 8-43.  These include local

5   moderators, the Modsquad, New Group Approvers, Group Outreach and Assistants, Interim

6   Moderators, and Penguin Patrol, which are described in further detail below.  Id.

7                        **III.   LEGAL STANDARD**

8   **A.       Motions for Summary Judgment**

9       Summary judgment or adjudication is not appropriate if a material issue of fact exists for

10  trial.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995) (citation omitted).  The

11  underlying facts must be viewed in the light most favorable to the party opposing the motion.

12  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  "[S]ummary

13  judgment will not lie if … the evidence is such that a reasonable jury could return a verdict for

14  the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation

15  omitted).  The party moving for summary judgment or adjudication has the burden to show

16  initially the absence of a genuine issue concerning any material fact.  Adickes v. S.H. Kress &

17  Co., 398 U.S. 144, 159 (1970).  "Because of the intensely factual nature of trademark disputes,

18  summary judgment is generally disfavored in the trademark arena."  KP Permanent Make-up,

19  Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005) (quoting Entrepreneur

20  Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir. 2002)).

21                          **IV.   ARGUMENT**

22  **A.       A Genuine Issue of Material Fact Exists as to Whether The Freecycle
             Network Established Quality Control Standards to Ensure a Consistent
23           User Experience For All Members of The Freecycle Network's Affiliated
24           Groups**

25      Ownership of a valid trademark requires only that a trademark licensor protect the public

26  from deceptive uses of a trademark by "polic[ing] in a reasonable manner the activities of his

27  licensees."  Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959).

28  While this requirement implies the existence of quality standards to police, courts have never

1   required trademark licensors to explicitly define such standards, nor have they discussed how

2   concrete such standards must be.  To the contrary, courts have often held that quality controls

3   absent concretely defined standards are adequate to avoid a claim of naked licensing.  *See, e.g.*,

4   Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1985) (upholding a

5   jury's determination that no naked licensing occurred even where licensor did have explicitly

6   defined quality standards); *see also* Arner v. Sharper Image Corp., 39 U.S.P.Q.2d 1282, 1288

7   (C.D. Cal. 1995) (holding that provisions in a license agreement that required a licensee to

8   inform a licensor of changes in the licensed products were enough to raise a genuine issue of

9   material fact as to whether naked licensing occurred, even without evidence of any quality

10  standards held by the licensor).  Ultimately, the concern of courts is that the quality of the

11  products or services offered under the trademark are consistent from licensee to licensee,

12  regardless of what standards are in place or how formalized those standards are.  Barcamerica

13  Intern. USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 598 (9th Cir. 2002).

14          Plaintiff would have the Court believe that The Freecycle Network established no quality

15  controls.  However, The Freecycle Network has offered substantial evidence showing that, from

16  its inception, it has maintained some level of formal or informal quality standards that have

17  ensured a consistent experience for its users that prevents any deception.  Those standards

18  include: 1) a requirement that all postings be "free, legal, and appropriate for all ages;" 2)

19  general rules governing the procedure for posting items, the look and feel of Freecycle groups,

20  and the number of Freecycle groups in a particular region; 3) the terms and conditions of Yahoo!

21  Groups; and 4) the Freecycle Ethos that guarantees decentralized, democratic control that allows

22  for adaptation to regional needs.  Beal Decl., ¶¶ 9, 10, 20, 21; Kobialka Decl., ¶¶ 11-13, 27, 40,

23  42-44, 51-52, 76, 111, Exs. 9-11, 25, 38, 40-42, 49-50, 74, 109.  As such, this abundance of

24  evidence at the very least creates a genuine dispute of fact as to whether and to what degree The

25  Freecycle Network established quality control standards.  Plaintiff, therefore, is not entitled to

26  summary judgment.

27

28

1    **1.    "Free, Legal, and Appropriate for All Ages"**

2    Although developed and implemented earlier, The Freecycle Network approved as an

3    official rule in January 2004 the quality control that all postings to its member groups be "free,

4    legal, and appropriate for all ages." Plaintiff argues that, because the qualities of being "free,

5    legal, and appropriate for all ages" are not unique to The Freecycle Network, they cannot be

6    valid quality standards. However, the "free" requirement differentiates itself from other groups,

7    such as Craigslist (*see* http://www.craigslit.org), because The Freecycle Network's groups are

8    assured that they will not be co-opted by those seeking to make a profit by selling their goods or

9    by those seeking a black market for their illegal goods. Additionally, the "appropriate for all

10   ages" standard is not so ambiguous as to preclude it from being a quality standard. The

11   Freecycle Network clearly defines the phrase as meaning, at a minimum, "no Alcohol, Tobacco,

12   Firearms or Drugs, legal or otherwise." Kobialka Decl., ¶¶ 10, 43-44, 53, 61, 76, Exhs. 8, 41,

13   42, 51, 59, 74. Though moderators in the modsquad debate whether some particular items fall

14   within the umbrella of "appropriate for all ages," these items are in the minority, and the core of

15   what is considered "appropriate for all ages" is clear. Id., ¶¶ 10, 53, 60-61, Exhs. 8, 51, 58-59.

16   The fact that The Freecycle Network allows groups to interpret at the fringes what the phrase

17   means does not preclude it from being a quality standard, and Courts do not require trademark

18   licensors to create quality standards that are devoid of all ambiguities.

19   Further, Plaintiff's argument that this rule is not unique has no basis in the law and

20   would make little sense in practice. The Freecycle Network is not required to define quality

21   standards that uniquely identify it from all other providers of re-using, re-gifting, and recycling

22   services. Rather, The Freecycle Network needs to define *any* quality standards that ensure

23   consistency among its licensees such that consumers are not deceived. The Freecycle Network

24   satisfies this requirement with its "free, legal, and appropriate for all ages" quality standard.

25   **2.    Other Quality Standards**

26   Contrary to Plaintiff's contention, The Freecycle Network provides numerous other

27   quality standards to its member groups. For example, The Freecycle Network's rules and

28   guidelines ensure a consistent look, feel, and experience across all The Freecycle Network

groups.  Id., ¶¶ 9, 16, 40, 44, 52, Exhs. 7, 14, 38, 42, 50.  As early as September of 2003, Mr. Beal sent a copy of The Freecycle Network's "ettiquette" [sic] to a new group in Portland.  Id., ¶ 16, Exh. 14.  Further, procedures for uniform posting, crossposting, geographic limitations, bans on activities such as curbside pickup offers, barter offers, and other activities deemed by The Freecycle Network to be outside of its mission, impart on all Freecycle groups a similar look and feel that consumers associate with the Freecycle mark.  Id., ¶¶ 16, 40, 43-44, 52, 54, 58, 94, Exhs. 14, 38, 41-42, 50, 52, 56, 92.  Moderators have enforced these quality standards since October 13, 2003, thus, a material issue of disputed fact exists as to whether these quality standards are in place.

### 3.    Yahoo! Groups Terms and Conditions

Another quality standard that Plaintiff fails to acknowledge is The Freecycle Network's incorporation of Yahoo!'s standards for its message boards, which also maintains a level of consistency among all of its groups.  Kobialka Decl., ¶ 29, Exh. 27.  Since 2003, all The Freecycle Network groups have been required to follow the Terms and Conditions of Yahoo! Groups.  Id., ¶¶ 29, 70, 92, Exhs. 27, 68, 90; Beal Decl., ¶ 20.  The rules of conduct on Yahoo! Groups includes prohibitions on impersonating others, stalking members, sending spam messages, or harassing others.  Kobialka Decl., ¶ 29, Exh. 27.  The Penguin Patrol monitors the online member groups to identify "rogue groups," those groups that fail to comply with The Freecycle Network's rules and etiquette, and especially its Trademark policy.  Beal Decl., ¶ 19, Exhs. 6, 42-43.  After sending the non-compliant groups cease and desist letters, the Penguin Patrol contacts Yahoo! and notifies them of the non-compliant groups.  Id.  Yahoo! would then enforce the quality control by terminating all non-compliant member groups.  Id., ¶ 8.

### 4.    The Freecycle Ethos

One of the most important quality standards The Freecycle Network upholds is the "Freecycle Ethos," which, as discussed in detail above, has been present since the inception of The Freecycle Network.  Id., ¶ 9.  This Ethos guarantees, among other things, decentralized, participatory leadership that allows groups to adapt to their own regional needs.  Id.; Kobialka

1    Decl., ¶¶ 11-13, 27, 76. Exhs. 9-11, 25, 74.  For example, The Freecycle Network's

2    empowerment of local moderators to decide, at the fringes, what constitutes "appropriate for all

3    ages" ensures that what a New York City group might consider appropriate for children does not

4    have to govern what a group in Abilene, Texas believes is appropriate.  Kobialka Decl., ¶¶ 10,

5    63, Exhs. 8, 61.  The fact that local moderators are able to adapt the general The Freecycle

6    Network policies to their communities does not demonstrate, as Plaintiff contends, that The

7    Freecycle Network lacks quality standards, because the core The Freecycle Network policies and

8    procedures remain in place and consistent from group to group.  Id., ¶ 51, Exhs. 49.  Instead, the

9    guarantee of local flexibility itself serves as an important quality standard that helps define the

10   Freecycle Ethos.  Id., ¶¶ 10, 27, 51, Exhs. 8, 25, 49.  Whether the Freecycle Ethos is

11   meaningfully and viably decentralized, or "decidedly hands off" is a factual dispute precluding

12   summary adjudication at this time.

**B.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle
        Network Retains an Implied Contractual Right to Inspect and Supervise
        Member Groups**

15         Though not a requirement to prevent naked licensing, a contractual right to inspect and

16   supervise licensees serves as evidence of the requisite quality control measures.  Barcamerica,

17   289 F.3d at 596 ("The lack of an express contract right to inspect and supervise a licensee's

18   operations is not conclusive evidence of lack of control.").  As long as "the particular

19   circumstances of the licensing arrangement indicate that the public will not be deceived," no

20   naked licensing has occurred.  Id.

21         An implied license granted by a non-profit organization can serve as the basis for a

22   contractual right to inspect and supervise where the organization maintains guiding principles

23   that define how member groups behave.  Birthright v. Birthright Inc., 29 U.S.P.Q.2d 1081

24   (D.N.J. 1993).  In Birthright, the trademark owner, a decentralized, non-profit organization

25   providing pregnancy counseling services, permitted volunteers to charter local chapters of the

26   organization and use the organization's trademarks.  The organization was founded in 1968 and

27   had expanded to include 43 entities operating around the country by 1971, when the

28   organization first drafted the "Birthright Charter," a document defining the organization's

1    "underlying philosophy and guiding principles." Id. at 1885-86.  The court held that, even after

2    20 years of use pursuant to an implied license, the mark had not been abandoned because

3    "defendants' use was subject to their compliance with the Birthright Charter and policy

4    directives, as monitored and controlled by the Birthright Board." Id. at 1098-99.  The court

5    focused on the fact that "the parties were clearly not competitors" but rather "belonged to a

6    single movement composed of many entities which, however loosely organized, retained a

7    structure of authority as to such matters as monitoring and control of the "Birthright" name and

8    … logo." Id. at 1099.

9          The Freecycle Network's evidence that it granted implied licenses subject to adherence

10    to The Freecycle Network's policies and procedures is enough, at the very least, to create a

11    triable issue of fact as to whether The Freecycle Network retains an implied contractual right to

12    inspect and supervise its member groups.  The Freecycle Network has submitted evidence

13    showing that, as in Birthright, its groups are not "competitors, " but form a "single movement

14    composed of many entities" with a "structure of authority" (the modsquad, NGAs, GOAs, I-

15    Mods, Penguin Patrol), that monitors and controls the "FREECYCLE" name and logo.  As an

16    umbrella organization, The Freecycle Network coordinates the reuse, recycling, and gifting of

17    goods through its local member groups, who then coordinates the service to its members in the

18    community.  Since The Freecycle Network's mission is to reduce waste and ease the burden of

19    landfills, each member group works cooperatively with The Freecycle Network to ensure the

20    efficiency of its recycling efforts, including The Freecycle Network's creation, maintenance, and

21    enforcement of rules, etiquette, and procedures for the recycling of goods.  The Freecycle

22    Network's evidence also shows that it has and continues to revoke its implied licenses from

23    groups who have failed to follow this mandate and have strayed from the Freecycle mission.

24    Kobialka Decl., ¶¶ 69, 87, 96-97, Exhs. 67, 85, 94-95.  Thus, a factual dispute exists as to

25    whether member groups understand that any use of the FREECYCLE mark subjects them to the

26    inspection and supervision of The Freecycle Network.

27

28

1

**C.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle Network Engages in Actual Quality Control That Prevents Deception of the Public**

2

3          Contrary to the Plaintiff's contentions, The Freecycle Network's evidence shows that it

4    engages in actual quality control efforts satisfying the quality control requirements.  At the very

5    least, genuine issues of material fact remain that render summary adjudication inappropriate at

6    this time.  In any case, the existence of actual quality controls, even absent a contractual right to

7    control, satisfies the requirements against naked licensing.  *See* <u>Barcamerica</u>, 289 F.3d at 596

8    ("There need not be formal quality control where the particular circumstances of the licensing

9    arrangement indicate that the public will not be deceived.") (quotation and citations omitted);

10   *see also* <u>Dawn Donut</u>, 267 F.2d at 368 ("The absence . . . of an express contract right to inspect

11   and supervise a licensee's operations does not mean that the plaintiff's method of licensing

12   failed to comply with the requirements of the Lanham Act. . . . [T]he question . . . is whether the

13   plaintiff in fact exercised sufficient control.").

14          The required level of actual quality control is flexible and varies with "the wide range of

15   licensing situations in use in the modern marketplace."  <u>Barcamerica</u>, 289 F.3d at 598 (quotation

16   omitted).  The only requirement is that the controls be adequate to prevent the mark from

17   "ceasing to function as a symbol of quality and controlled source" and to ensure that the public

18   is not deceived.  <u>Id</u>. at 596 (quotation omitted); <u>First Interstate Bancorp v. Stenquist</u>, 16

19   U.S.P.Q.2d 1704, 1706 (N.D. Cal. 1990) ("[T]he amount of control a licensor must have over a

20   licensee is limited to that which is necessary to prevent deception.") (citations omitted).  The

21   Freecycle Network satisfies this flexible requirement for actual quality controls because, at every

22   stage in its history, The Freecycle Network instituted quality control measures commensurate

23   with its size, service, and the expectations of the public.

24

**1.    The Freecycle Network's Actual Quality Controls Are More Than Sufficient Given the Minimal Quality Controls Required for Simple Services Like The Freecycle Network's**

25

26          The level of quality control necessary to prevent naked licensing varies according to the

27   complexity of the product.  Simple products need only minimal quality controls.  In

28   <u>Barcamerica</u>, the court held that the "Da Vinci" mark had been abandoned by virtue of being

- 16 -

1   licensed to a winery without adequate quality controls.  <u>Barcamerica</u>, 289 F.3d at 598.  The only

2   evidence of quality controls were the mark owner's "random tastings and [] reliance on [the

3   licensee's] reputation" and he provided no evidence of "when, how often, and under what

4   circumstances" he tasted the wine.  <u>Id</u>. at 596-97.  According to the court, with a "relatively

5   simple product" like wine, the owner needed only to "sample . . . on an annual basis, in some

6   organized way, some adequate number of bottles of the Renaissance wines which were to bear

7   Barcamerica's mark."  <u>Id</u>. at 598.

8        The Freecycle Network's re-using, re-gifting, and recycling services are relatively simple

9   and require less quality control than more complex goods or services.  As in <u>Barcamerica</u>, the

10  operation of a recycling message board is simple and straightforward.  Nevertheless, the quality

11  controls instituted by The Freecycle Network are far more elaborate than the simple annual wine

12  tastings required by the court in <u>Barcamerica</u>.  The Freecycle Network has developed a multi-

13  tiered quality oversight hierarchy, including moderators, NGAs, GOAs, I-Mods, and Penguin

14  Patrol, dedicated to enforcing The Freecycle Network rules and responding to complaints from

15  members of The Freecycle Network groups.  Beal Decl., ¶¶ 11-19, Exhs. 8-43; Kobialka Decl.,

16  ¶¶ 79, 87-88, 98-99, Exhs. 76, 85, 86, 96, 97.  The NGAs, the first level of quality control,

17  regulate which groups are allowed to join The Freecycle Network based on their size,

18  geography, and their adherence to The Freecycle Network guidelines.  Beal Decl., ¶ 15, Exhs.

19  28-30; Kobialka Decl., ¶¶ 20, 83-85, Exhs. 18, 81-83.  While Plaintiff has argued that new

20  groups were started without any approval process, <i>e.g.</i> Kenneth Heddon's groups, contrary

21  evidence indicates that NGAs carefully screened new groups prior to approval.  As one example,

22  a Johnson County, Indiana group applied to start a Freecycle group and "patiently waited" to get

23  approval, which it eventually did.  Kobialka Decl., ¶ 30, Exh. 28.  Such a factual dispute

24  precludes summary adjudication.

25        In addition to NGAs, moderators have enforced The Freecycle Network's rules,

26  etiquette, and quality control guidelines since October 2003.  The moderators inspect and

27  supervise the appropriateness of members' messages and postings, ensure that member groups

28  have a back-up co-owner, maintain an efficient and practical web site, and answer questions by

THE FREECYCLE NETWORK, INC.'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY ADJUDICATION UNDER FED.R.CIV.P. 56

CASE NO. C 06-00324 CW

1  applying and policing The Freecycle Networks' rules and standards.  Beal Decl., ¶¶ 12-14, Exhs.

2  8-27; Kobialka Decl., ¶¶ 10, 51, 64, Exhs. 8, 49, 62.  For example, a Freecycle group in

3  Westchase explicitly "obey[ed] [the] written and published rules of the Freecycle ™ network

4  group" and banned a member who had been spamming other group members.  Kobialka Decl., ¶

5  96, Exh. 94.  To the extent that Plaintiff disputes this fact, arguing that The Freecycle Network

6  never enforced such rules and policies upon the then freecyclesunnyvale group, issues of

7  material fact remain that preclude summary adjudication at this time.

8      Besides NGAs and moderators, The Freecycle Network created Group Outreach and

9  Assistance ("GOAs") in September 2004 to oversee the groups that have already been approved,

10  investigating reported violations of The Freecycle Network policies and advising local

11  moderators on inter-group issues, such as flame wars, as well as overlapping issues with other

12  member groups.  Beal Decl., ¶ 17, Exhs. 5, 10, 32-39; Kobialka Decl., ¶¶ 20, 22, 31, 63, 70, 87-

13  88, 103, 110, Exhs. 18, 20, 29, 61, 68, 85, 86, 101, 108.

14      Also, the Interim Moderator Team ("I-Mods") are responsible for temporarily

15  moderating the group's compliance with The Freecycle Network's rules and Etiquette where the

16  moderators had abandoned or wanted to stop moderating their group.  Beal Decl., ¶ 18, Exhs.

17  40-41; Kobialka Decl., ¶¶ 85, 89, Exhs. 83, 87.  Moreover, I-Mods set up a replacement group

18  for deleted groups or for groups that have been removed from the network.  Beal Decl., ¶ 18,

19  Exhs. 40-41; Kobialka Decl., ¶¶ 85, 89, Exhs. 83, 87.  The new groups must comply with The

20  Freecycle Network's rule that replacement or headless groups to have at least two co-owners, the

21  fictional co-owner Ersatzfriend and an interim moderator.  Beal Decl., ¶ 16, Exh. 31.

22      Finally, the Penguin Patrol establishes and polices the use of The Freecycle Network

23  trademarks, including educating moderators on trademark matters and answering their questions.

24  The Penguin Patrol monitors unaffiliated rogue groups using the Freecycle mark and sends cease

25  and desist letters to non-compliant groups and dissidents.  Id., ¶19, Exhs. 6, 42-43.

26      The existence of these controls is what is important, not the effectiveness of the controls,

27  and a licensor need not control every aspect of its licensee's business.  Kentucky Fried Chicken

28  Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977) ("We must determine

- 18 -

1    whether Kentucky Fried has abandoned quality control; the consuming public must be the judge

2    of whether the quality control efforts have been ineffectual"); <u>Arthur Murray, Inc. v. Horst</u>, 110

3    F. Supp. 678, 679-80 (D. Mass. 1953).  Plaintiff freely admits that quality controls exist here.

4    Instead, Plaintiff argues that, because The Freecycle Network does not control every aspect of its

5    member groups activities with a totalitarian fervor, it did not "monitor and supervise" its groups.

6    For example, Plaintiff argues that, because the GOAs did not strictly enforce every rule in every

7    possible applicable situation, their oversight of groups could not be considered adequate.

8    However, the fact that the quality control enforcers are empowered to make judgment calls

9    based on the seriousness of a particular infraction does not negate the fact that these quality

10    controls do exist.  Trademark law does not require licensors to develop a Stalinistic relationship

11    with their licensees in order to prevent the public from being deceived.

12          **2.    The Freecycle Network's Actual Quality Controls Are More Than
                Sufficient To Prevent Deception of the Public Given the Public's
13              Expectations**

14          Because the purpose of quality controls is to prevent the deception of the public rather

15    than ensure a high quality good, the public's expectations of quality must factor into the level of

16    quality control required.  *See* <u>Barcamerica</u>, 289 F.3d at 596.  If the public expects variation in the

17    quality of a good or service from licensee to licensee, lower quality controls are necessary, since

18    no deception will occur if those expectations are realized.  Because the public is aware that The

19    Freecycle Network is a decentralized, grass-roots organization offering its services for free, it

20    must expect some level of informality and variation in rules and policies from group to group.

21    Kobialka Decl., ¶¶ 11-13, 27, 97, Exhs. 9-11, 25, 95.  Given these expectations, minimal quality

22    controls are enough to prevent the deception of the public.  As discussed above, the quality

23    controls The Freecycle Network instituted far surpass the minimal controls required by

24    trademark law.

25          **3.    The Freecycle Network Exercised Sufficient Quality Standards and
                Controls and thus, Precludes a Finding of Naked Licensing**
26

27          Contrary to Plaintiff's assertion that The Freecycle Network had little to no involvement

28    in quality standards and control of its service, The Freecycle Network was involved in providing

1    its rules, Etiquette, and guidelines from Plaintiff's inception, ensuring that volunteer moderators,

2    such as Abraham, monitored and supervised its members, and policing its trademark policy,

3    which it found Plaintiff to have violated.  Abraham claims, in her declaration, that "[m]any

4    freecycling organizations promote freecycling by maintaining online groups" and that she started

5    FreecycleSunnyvale by merely "registering with an internet provider, such as Yahoo!," however,

6    Plaintiff fails to provide evidence of these alleged "freecyling organizations."  *See* Abraham

7    Decl., ¶¶ 3-4.  Instead, it was Albert Kaufman, owner of the FreecyclePortland, an official

8    member group of The Freecycle Network, that invited Lisanne Abraham in 2003 to be part of

9    The Freecycle Network.  Kobialka Decl., ¶ 113, Exh. 111 (Deposition of Lisanne Abraham at

10   13:21-14:8).  Kaufman contacted Abraham and persuaded her to join The Freecycle Network.

11   *See* Abraham Decl., ¶ 9.  He further instructed her to follow The Freecycle Network's guidelines

12   and set up an internet web site using using free hosting services offered by Yahoo!, Inc., to

13   promote the service recycling services in Sunnyvale, California.  Id.  Kaufman further instructed

14   Abraham to contact The Freecycle Network for use of The Freecycle Network logo.  Kobialka

15   Decl., ¶ 113, Exh. 111 (Abraham Depo. at 14:8-11).  The Freecycle Network licensed its

16   distinctive FREECYCLE logo for non-commercial use to Abraham to use on her Yahoo! Groups

17   web site.  Id. at 15:8-11; 27:22-28:3; 41:25-42:6.  The use of the logo on the Plaintiff's web site

18   was subject to specific rules which govern all member organizations of The Freecycle Network,

19   including the most important requirement that the logo may not be used for commercial use.  Id.

20   at 41:1-18.  This quality control was essential to maintaining The Freecycle Network's Ethos of

21   acting selflessly and without personal gain.

22        Mr. Beal welcomed Plaintiff to The Freecycle Network and provided Plaintiff with its

23   Rules & Etiquette and guidelines, which Plaintiff utilized and maintained for its member group.

24   Id. at 45:1-10; Beal Decl., ¶ 29, Exh. 46; *see* Abraham Decl., ¶ 17, Exh. E.  In recognition of

25   Plaintiff's status as a member group, The Freecycle Network maintained a link to Plaintiff's

26   website on the www.freecycle.org site.  Kobialka Decl., ¶ 113, Exh. 111 (Abraham Depo. at

27   21:5-10).  The Freecycle Network further provided support through its mechanisms for

28   monitoring the service through the use of moderators, NGAs, Ersatzfriend, GOAs, iMods, and

1    the Penguin Patrol.  Beal Decl., ¶ 11.  From Plaintiff's inception, Abraham held a volunteer

2    position with The Freecycle Network as a moderator of Plaintiff's website and volunteered to be

3    part of The Freecycle Network's Modsquad.  Kobialka Decl., ¶ 113, Exh. 111 (Abraham Depo.

4    at 21:11-20; 21:24-25:3).  Abraham's role as a moderator and as part of The Freecycle Network

5    Modsquad demonstrates that Plaintiff's group was monitored and supervised by mechanisms

6    created by The Freecycle Network.  Abraham monitored members' messages to ensure

7    compliance with The Freecycle Network rules and Etiquette before she approved their posts.  Id.

8    at 86:16-87:4.  When she encountered a "tough call," she utilized The Freecycle Network's

9    mechanism of contacting and interacting with other moderators to discuss any issues and any

10   policies or procedures.  Id.

11       Finally, despite Plaintiff's awareness of The Freecycle Network's Trademark policy and

12   its warnings by The Freecycle Network to comply with this important quality control, The

13   Freecycle Network was forced to terminate Plaintiff as a member group.  Id. at 41:1-24.  On two

14   separate occasions, The Freecycle Network asked Plaintiff to cease using the logo due to the

15   failure to abide by the rules The Freecycle Network required of all member organizations.

16   Despite these warnings, Plaintiff continued to use The Freecycle Network's logo improperly.  Id.

17   at 41:1-24.  On November 21, 2005, Yahoo! suspended Plaintiff's free internet web site, citing a

18   possible violation of Yahoo!'s Terms of Service.  Id. at 16:7-16.  Shortly thereafter, Plaintiff

19   secured a new, free, web site with Yahoo! Groups under the name "sunnyvalefree" that is in

20   operation today.  Thus, the experience Plaintiff had actually demonstrates that The Freecycle

21   Network implemented quality controls with respect to use of its FREECYCLE mark and logo.

22   This alone justifies denial of summary judgment.

23       Similarly, Robertson cannot claim that at the time he set up "FreecycleStillwaterOK,"

24   that he "was unaware of TFN or its website" and that he ran the group "independently and

25   without any assistance or guidance from [either] TFN or Mr. Beal."  Declaration of Miles

26   Dennis Robertson, Jr. in Support of Freecyclesunnyvale's Motion for Summary Adjudication

27   ("Robertson Decl."), ¶¶ 6-7.  Mr. Beal specifically guided and instructed Robertson on The

28   Freecycle Network's procedures on how to start a local member group (through Yahoo! groups),

1  provided Robertson with The Freecycle Network's rules and etiquette, and instructed Robertson

2  on how to gain experience so that he could be a moderator and monitor The Freecycle

3  Network's rules and etiquette.  Beal Decl., ¶ 30.  Robertson continued to become an NGA and

4  approved new member groups pursuant to The Freecycle Network's policies, including setting

5  up through Yahoo! and providing new groups with the rules and etiquette.  Robertson Decl., ¶¶

6  14, 17.  Even if Robertson did not know of the official name of the web site or the name of

7  organization founded by Mr. Beal, Robertson complied with and indeed enforced its quality

8  standards and controls in creating his member group.  Id., ¶¶16-18.

9      Despite Robertson's claim that while he was a GOA, "a complaint was not always

10  investigated immediately," The Freecycle Network continuously provided quality standards and

11  enforcement mechanisms to maintain its quality.  Id., ¶ 25.  Robertson may have been dilatory in

12  is duties, however, that does not speak to whether other monitoring groups, such as NGAs,

13  GOAs, moderators, iMods, and Penguin Patrol, failed to comply with The Freecycle Network's

14  policies and procedures.  Plaintiff cannot overcome its stringent standard of proof given the

15  sufficient quality standards and controls set out by The Freecycle Network's rules and

16  procedures, as well its mechanisms to monitor those rules.

17  **D.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle
        Network's Quality Control Efforts Were Belated**

18      The Freecycle Network implemented informal quality controls initially due to its

19  service's size and nature.  However, as the The Freecycle Network's member groups grew, it

20  quickly implemented quality control efforts to monitor and supervise The Freecycle Network

21  Ethos and rules.  Beal Decl., ¶ 11.  The Freecycle Network certainly had quality controls in

22  place when it set up the NGAs and GOAs in September of 2004.  There was nothing in The

23  Freecycle Network's conduct that would render The Freecycle Network's Marks abandoned.

24  The only authority Plaintiff cites for the prospect that a mark loses all protection and cannot be

25  revived after an 18 month period without quality controls is a "holding" that it manufactures by

26  pasting together out-of-context quotes from Halo Management, LLC v. Interland, Inc., 2004 WL

27  1781013 (N.D. Cal. Aug. 10, 2004).  Motion at 19-20.  Halo Management did not hold, as

28

1   Plaintiff contends, that a six month delay in quality controls alone was inexcusable.  Rather, the

2   six month delay was cited as one minor factor among many that rendered the mark in question

3   abandoned.  Halo Management, 2004 WL 1781013, at *6 (describing mark owner's efforts at

4   quality control as "tardy, dilatory, and facile" and "uniformly tardy, unsystematic, and

5   unavailing").  There, the only evidence of any quality control was two email messages sent in

6   preparation of litigation that thanked the licensee for "promoting a positive message" and noting

7   that it was "kind of important to check up" on the use of the mark to prevent "a loss of rights."

8   Id.  The court was suspicious of the timing of the messages, which "coincided with (and helped

9   prepare for) [the mark owner's] filing of this litigation," noting that "[s]uch transparent *post hoc*

10  gestures are not sufficient to revive an abandoned mark, nor do they function as adequate quality

11  controls."  Id.

12          Here, The Freecycle Network's quality controls were neither tardy, dilatory, nor facile.

13  As discussed above, The Freecycle Network has maintained quality controls from its inception

14  that have been sufficient, based on the service's size and nature, to prevent the public from being

15  deceived.  As a small, grassroots organization, the quality controls were headed up by Deron

16  Beal, and evolved as needed over time.  Kobialka Decl., ¶¶ 14-16, 65, 81, 100-02, Exs. 12, 13,

17  14, 63, 79, 98-100.  Though these quality controls were largely informal, they worked.  Id.  In

18  response to the growth, The Freecycle Network quickly formed new, more formalized

19  mechanisms, such as the ModSquad, NGAs, and GOAs, to deal with the needs of a larger

20  network of member groups.  Beal Decl., ¶¶ 11-19, Exhs. 8-43; Kobialka Decl., ¶¶ 51, 103, Exs.

21  49, 101.  The growth of these enforcement mechanisms illustrates exactly how concerned The

22  Freecycle Network was, at every step in its existence, with maintaining a consistent level of

23  quality and ensuring that the Freecycle Ethos remained alive in every Freecycle group.  As a

24  result, The Freecycle Network's quality controls are real and effective, borne out of The

25  Freecycle Network's desire to maintain the Freecycle Ethos.  They are not merely "transparent

26  *post hoc* gestures" undertaken in preparation of litigation.

27

28

1  **E.    A Genuine Issue of Material Fact Exists as to Whether The Freecycle**
2  **Network Currently Engages In Quality Controls**

3        The Freecycle Network's quality control measures discussed above continue to exist and

4  to regulate the quality of services provided by Freecycle groups.  The fact that The Freecycle

5  Network refused production of certain files held by some of its licensees because it lacked the

6  "possession, custody or control" required under Fed. R. Civ. P. 34(a) is completely irrelevant to

7  the question of quality controls for a trademark.  Indeed, Plaintiff did not move to compel these

8  documents prior to filing its motion.  The requisite quality control required for naked licensing

9  has nothing to do with the standard for "possession, custody or control" for purposes of

10 discovery.  The evidence offered by The Freecycle Network at the very least creates genuine

11 issues of material fact that preclude Plaintiff's motion for summary adjudication.

12 **F.    Summary Judgment Should Be Denied Because Even if The Freecycle**
13 **Network Engaged in Naked Licensing, It Has At the Very Least Recaptured**
   **Its Rights in the Marks**

14       As described above, The Freecycle Network has set in place in formal requirements such

15 that today, the Marks are strongly associated with The Freecycle Network.[2]  This includes

16 numerous policies, such as the Trademark policy.  Thus, at the very least, The Freecycle

17 Network recaptured its rights in the Marks through the establishment of stringent quality control

18 standards.  As such, rights in the Marks, if ever previously lost, have since been regained

19 through The Freecycle Network's current implementation and enforcement of quality control

20 standards over the Marks.  Plaintiff itself admits that The Freecycle Network presently enforces

21 the quality of the Marks, but fails entirely to justify why the Marks should still be abandoned

22 based on past alleged naked licensing.

23
24
25
26
27
     [2] The Freecycle Network does not admit that it has engaged in any naked licensing of the
28 Marks during any period of time.

1

**V.   CONCLUSION**

2       For the foregoing reasons, The Freecycle Network respectfully requests that this Court

3  deny Plaintiff's MSJ.

4
    DATED:  September 6, 2007.          **PERKINS COIE LLP**
5

6                                        By _____/s/ Lisa Kobialka_____
                                            Paul J. Andre
7                                           Lisa Kobialka
                                            Esha Bandyopadhyay
8                                           Sean M. Boyle
                                            Attorneys for Defendant
9                                           THE FREECYCLE NETWORK, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28