United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FREECYCLESUNNYVALE, a California
unincorporated association,

      Plaintiff/Counterclaim
      Defendant,

  v.

THE FREECYCLE NETWORK, INC., an
Arizona corporation,

      Defendant/Counterclaimant.

_____/

No. C 06-00324 CW

ORDER GRANTING IN
PART PLAINTIFF'S
MOTION FOR
SUMMARY JUDGMENT
AND DENYING IT IN
PART AND GRANTING
DEFENDANT'S
MOTION TO STRIKE

    Plaintiff and Counterclaim-Defendant FreecycleSunnyvale filed
a motion for partial summary judgment. Defendant and
Counterclaimant The Freecycle Network (TFN), Inc. opposed the
motion and moved to strike a declaration filed in support of
Plaintiff's motion. The motions were heard on September 27, 2007.
At the hearing, Plaintiff argued that the Ninth Circuit's recent
opinion in The Freecycle Network, Inc. v. Oey, 505 F.3d 898 (9th
Cir. 2007), entitled it to summary judgment on all claims and

Dockets.Justia.com

counterclaims.  The Court requested additional briefing on the
issue.  Plaintiff has now filed a supplemental motion for summary
judgment, which Defendant opposes.  Having considered all of the
parties' papers and oral argument on the motions, the Court grants
in part Plaintiff's motion for summary judgment and denies it in
part and grants Defendant's motion to strike.

BACKGROUND

In this case, Plaintiff brings claims for declaratory judgment
of non-infringement of trademarks and tortious interference with
business relations.  Defendant brings counterclaims for trademark
infringement and unfair competition under the Lanham Act and unfair
competition under California Business and Professions Code § 17200.

As set out more fully in the Court's earlier orders, Plaintiff
is a non-profit organization with its principal place of business
in Sunnyvale, California.  Defendant is an Arizona non-profit
organization with its principal place of business in Tuscon,
Arizona.  Its purpose is to promote recycling by providing support
and acting as a central organizing point for local community-based
recycling efforts throughout the United States and abroad.
Defendant alleges that it "is the sole owner of the inherently
distinctive and famous trademarks 'FREECYCLE' and 'The Freecycle
Network,' and the inherently distinctive 'The Freecycle Network'
logo (collectively referred to as the 'Marks'), which it has been
using exclusively and continuously since at least May 1, 2003."
Amended Counterclaims ¶ 67.

On October 3, 2003, Lisanne Abraham received an email from her
friend Albert Kaufman who owned and moderated a "Freecycle" email

2

group in Portland, Oregon. In the email Kaufman discussed his
discovery of a group called Freecycle Tuscon, his experience in
setting up Freecycle Portland and encouraged his friends to "Join
the Freecycle Revolution." Abraham Decl., Ex. A at 1.

Abraham was interested in the idea and contacted Kaufman for
advice on how to do so. Kaufman replied, "Just create it and join
the revolution. I'm glad to help you spread the word, and
www.freecycle.org is a great place to get resources, too." Abraham
Decl., Ex. B. Abraham created a Yahoo! group[1] named
freecyclesunnyvale. She declares that she used the etiquette
guidelines she found on the main page of either Kaufman's Yahoo!
group or the Yahoo! group of Defendant's founder and later
executive director, Deron Beal. She states that she "lightly
edited the instructions, so [hers] were very similar to the other
two groups' but not verbatim." Abraham Decl. ¶ 11. The etiquette
guidelines Abraham included were,

> Welcome to the Sunnyvale Freecycle Network!
>
> To post a message to members of this group, send an
> email to freecyclesunnyvale@yahoogroups.com
>
> FREECYCLING ETIQUETTE
> 1) NO POLITICS & NO SPAM.  Two strikes & you're out.
> 2) SUBJECT LINE
>      Use these phrases:
>      OFFER:
>      TAKEN:

---

[1]Yahoo! groups is a free service offering, among other things,
email mailing lists, photo and file sharing and group calendars.
See http://groups.yahoo.com/.  Each Yahoo! group has a webpage
where members can see information about other members, messages
posted to the group and the photos and files that have been shared.
The Court refers to this page as the "main page" for the Yahoo!
group.

```
        WANTED: [Use sparingly]
        ADMIN: [Use for new idea specifically related to
            freecycling.]
     3) RESPONSES go only to offeror (not to whole group)
     4) PICKUP of items: Arrange however you want.  Generally
     1st response, 1st served; if a nonprofit/charity
     responds, you may want to give it first shot.
     5) CAN WE USE FREECYCLE TO FIND NEW HOMES FOR PETS?
     Yes, keep it legal & be lovingly careful
     6) KEEP IT FREE.  No trading or bartering, please.
     To unsubscribe, send an email to
     freecyclesunnyvale-unsubscribe@yahoogroups.com
     Have fun & keep on freecyclin' . . .
```

Id. at ¶ 11 (bracketed material in original).

Abraham informed Kaufman that she had created the group and asked him where to get a logo.  Kaufman advised her to "send Deron the URL so we can make sure it joins the others on www.freecycle.org, and Mark [Messinger][2] may be willing to help you out with a funky logo.  Or, I can just send you the font people are using, or you can just create something in photo shop or use this picture."  Id.

Abraham declares that she emailed Beal and Messinger and spoke with Beal by telephone but does not state the content of those conversations.  On October 9, 2003, Beal sent Abraham an email stating, "You can get the neutral logo from http://www.freecycle.org, just don't use it for commercial purpose or you [sic] maybe Mark or Albert can help you to do your own fancy schmancy logo!"  Abraham Decl., Ex. C.  Messinger responded that he could create a logo for FreecycleSunnyvale and gave her several options regarding the design.  In his email attaching the image, Messinger concluded, "Good luck with the Sunnyvale Freecycling

---

[2]In a later email to Abraham, Messinger identified himself as the "Olympia Freecycling Moderator."  See Abraham Decl., Ex. D.

4

group" and signed the message "Olympia Freecycling Moderator." Abraham Decl., Ex. D. The logo Messinger created was substantially similar to the image he created for the Portland group and the image at issue in this case. Abraham further declares that around the same time, FreecycleSunnyvale was added to the list of groups on www.freecycle.org, enabling visitors to that website to click a link and be directed to her Yahoo! group main page.

On October 9, 2003, Beal also sent an email to the moderators of nineteen freecycle Yahoo! groups, welcoming the moderators to "the Freecycle Network." Abraham Decl., Ex. E. Beal indicated that he was including all of the existing freecycle Yahoo! group moderators, so they could contact one another "for ideas and input." Id. He also encouraged the moderators "to check out the various cool logo designs" and noted, "Portland even has the totally underground t-shirts available." Id. Beal raised the idea of creating a separate Yahoo! group for all of the group moderators to share ideas. The email did not include any restrictions or guidance on the use of the term freecycle or the freecycle logo. Beal signed the email, "Keep on Freecyclin'." Id.

On October 13, 2003, Abraham received an email invitation to join the "freecyclemodsquad" Yahoo! group (modsquad group) for moderators of freecycle Yahoo! groups. Id. at Ex. F. Abraham joined the group and declares, "[I] read the email exchanges for a month or two" but after that time, "the volume of email was so high that I didn't regularly read the messages, although for several months I saved the emails to an electronic folder." Id. at ¶ 6. Abraham declares that by the end of February, 2004 she stopped

5

reading or saving the emails from the group.

On January 4, 2004, Beal sent an email to the modsquad Yahoo! group, raising the question of "whether or not we should allow ALL legal items." Id. at Ex. G. Beal stated, "I believe we all need to decide this issue together as a group, whether or not we, The Freecycle Network, want to make a restriction here." Id. Beal further noted that the phrase, "Keep it Free, Legal & Appropriate For All Ages" appeared in the etiquette section of the freecycle.org website and asked "that all moderators vote on whether they feel this is the one rule that should apply to ALL local groups or not." Id. In a follow-up email, Beal emphasized that he was polling the group because he wanted them to make the decision together. Again, he signed the email, "Keep on Freecyclin'" and indicated his affiliation with "RISE, The Freecycle Network, A private, nonprofit freecycling, recycling & transitional employment provider." Abraham Decl., Ex. H.

A majority of the modsquad Yahoo! group members voted in the affirmative to the question, "Do you believe we should require that all local groups have the rule 'Keep it Free, Legal & Appropriate For All Ages?'" Id. at Ex. I. On January 11, 2004, Beal informed the group, "I'm glad to say we were actually able to decide, by a large majority, that we now have one true guiding principle." Id.

Although the members of the modsquad agreed to the "Keep it Free, Legal & Appropriate For All Ages" rule in January, 2004, there is no evidence that individual groups were required to adopt the rule at that time. FreecycleSunnyvale did not add the rule to its etiquette until June, 2004 and did not email it to the

United States District Court

For the Northern District of California

freecyclesunnyvale Yahoo! group members until July, 2004.

Moderators continued to post questions to the modsquad Yahoo! group and to receive feedback from other moderators. A frequent topic of discussion was the actual definition of "free, legal and appropriate for all ages." Beal participated in many of these conversations, with a general theme of encouraging local control over each of the freecycle groups.

Beal declares that in early 2004, his organization, Defendant TFN, created an intellectual property working group "tasked with developing guidelines for protecting The Freecycle Network's intellectual property, including The Freecycle Network's marks." Beal Decl. ¶ 25. Beal further declares that Defendant "requires all its members to abide by The Freecycle Network Trademark policy." Id. at ¶ 26. However, as discussed below, there is no evidence of the creation of that working group in 2004 or of any policy or directives regarding trademarks until January, 2005. See Oey Decl., Ex. CC.

Tim Oey became the lead volunteer moderator of the freecyclesunnyvale Yahoo! group[3] and a member of what Beal considered to be the "management/leadership team/crew/council." Id. at Ex. X. Oey declares that he became aware that Defendant "wanted to protect a trademark on the word 'freecycle'" sometime in September, 2004. Id. at ¶ 39. On September 16, 2004, Oey sent a message to the modsquad Yahoo! group suggesting that the group

---

[3]At her deposition, Abraham stated that Oey became a co-moderator about four months after she started the freecyclesunnyvale Yahoo! group. Kobialka Decl., Ex. 11 at 87.

begin to consider "intellectual property issues" because "the Freecycle Network is growing up." Beal Decl., Ex. 44. In that email, Oey warned,

> Everyone in the Freecycle network needs to protect the "Freecycle" trademark. Not only must trademarks be actively defended (as Deron is doing), they must also be used properly. Trademarks are adjectives, and must only be used as such . . . . Marks should never be used as nouns or verbs, nor should marks be pluralized or used in the possessive form. This is especially important in official Freecycle communications--web sites, autosent emails, etc. Unfortunately this does crimp the use of "Keep on Freecyclin'"--catchy, but risky.

Id. Oey also inquired, "What is the official name of the Freecycle non-profit?" and suggested that the group "come up with some sort of concise copyright policy for everyone to use that references the official full Freecycle name." Id. He recommended that the copyright include "a simple mini-license" that would allow groups to "re-use, edit, extract, redistribute, and update" materials "as long as this copyright statement is retained." Id. However, Oey declares that, to his knowledge, Defendant did not take any steps toward creating a trademark policy at that time.

During this period Defendant continued to create various teams composed of volunteers that communicated via email to discuss issues related to the growth of the freecycle network. For example, in September, 2004, Beal developed requirements for new groups and organized a New Group Approvers (NGA) group, which reviewed new groups before listing them on www.freecycle.org, and a Group Outreach and Assistance group, which handled complaints about various groups. Neither of these groups screened existing groups using the term freecycle or the freecycle logo or monitored

8

existing or new groups.  Between September, 2004 and September, 2005, Defendant required any new group to allow Defendant to include a fictional co-owner created and controlled by Defendant. Defendant stopped enforcing this requirement in September, 2005. There is evidence that the NGAs did not consistently apply Defendant's standards.  Oey was the NGA for California.

Oey continued to raise questions and concerns related to Defendant's trademark claim to the term "freecycle."  However, explicit in his communications regarding a potential trademark was Oey's question of whether Defendant actually wanted to protect the term.  For example, on November 8, 2004, Oey sent an email to the New Webpage Planning Team (NWPT) stating that "we are already close to losing the rights to the Freecycle mark," proposing a rule for Beal to send to all moderators to enforce with their groups and asking other members of the NWPT for their comments.  Oey Decl., Ex. AA.  The next day Oey sent another email to the group stating,

> Should we protect the mark "Freecycle" or let it become
> a generic term?  If we protect it we can prevent rogue
> groups from using it and have the term mean a certain
> level of quality in the service.  But this will require
> a bit of work on everyone's part.  If we let it become a
> new generic term, it can go into dictionaries, can be
> used by everyone, spreads the movement even further, and
> no one can prevent anyone from being able to use the
> term.  This will require no extra work as we are already
> on this path.  Which do we want?  Deron has said he
> wants to protect it but also expressed reluctance at
> trying to convince moderators to help protect it.  I
> think most moderators will understand but inevitably
> some will think this is yet another "rule" that is too
> much work.  If we take action now we can probably save
> the mark, if not it will become generic.

Id.

On January 5, 2005, Beal sent an email to the modsquad

9

instructing that "anything official should never use the word 'Freecycle' as anything but an adjective" and that the term "always needs to be capitalized." Id. at Ex. CC. Oey declares that during January, 2005, he "was the primary author for [Defendant] TFN's trademark policies" and that it was not until February, 2005 that he "first became aware that TFN was attempting to enforce a trademark policy by controlling how freecycling groups could use the word 'freecycle.'" Id. at ¶¶ 47, 48.

On February 7, 2005, an individual named Emily invited various moderators including Oey to join the Penguin Patrol, a group she was forming "to cover: rogue group pursuit . . . , database work . . ., Trademark policy & support . . ., Safety concerns . . . [and] General sleuthing." Id. at Exh. DD. Emily emphasized that the group was not to be open to the public or to all moderators and that the information discussed within the group was not to be assumed to be common knowledge. Among the tasks outlined for the group were sending cease and desist letters to "rogue groups" and establishing a policy on trademark and copyright issues. Id.

Oey was a member of the Penguin Patrol and declares that from "February 2005 to May 2005, [he] helped people with trademark issues." Id. at ¶ 48-49. However, in March, 2005, Oey "began to have doubts about [his] earlier decision to support TFN's pursuit of trademark rights in the word 'freecycle.'" Id. at ¶ 50. These doubts stemmed from an email posted to the freecyclesunnyvale Yahoo! group that suggested that the effort to trademark the word "freecycle" conflicted with the anti-corporate spirit of the group's concept. See id. at Ex. EE. Nonetheless, Oey "chose at

10

that time to continue to publicly support TFN's pursuit of trademark rights." Id. at ¶ 51.  However, he noted that between January and August, 2005, "TFN steadily lost a number of volunteers" and it was his understanding that "many of these volunteers left over TFN's decision to pursue trademark rights in the word 'freecycle' and TFN's treatment of local freecycling groups." Id. at ¶ 52.  By May, 2005, Oey had resigned from all of his "senior TFN volunteer roles" but stayed on as the moderator of the freecyclesunnyvale Yahoo! group. Id. at ¶ 55.

In August, 2005, "a large group of very active volunteers . . . left TFN suddenly." Id. ¶ 64.  Oey believes that "these individuals left TFN because of TFN's trademark policies and treatment of local freecycling groups." Id.  When Oey learned of these departures, he sent an email to the modsquad stating his belief that there were "two reasonable paths for Freecycle." Id. at Ex. MM.  One of these paths, Oey described as "the traditional corporate style path" and the other, he described as the "one where freecycle goes back to its roots, lets go, and becomes, again, a true, open, grassroots movement." Id.  The second path, which Oey advocated, involved abandoning "the Freecycle trademark pursuit." Id.  As described by the Ninth Circuit,

> In the following weeks, Oey made various statements on the Internet that TFN lacked trademark rights in 'freecycle' because it was a generic term, and he encouraged others to use the term in its generic sense and to write letters to the United States Patent and Trademark Office ("PTO") opposing TFN's pending registration.

Oey, 505 F.3d at 901.

11

On September 16, 2005, Paula Spencer, the TFN California Group Outreach and Assistance Team Member, sent Oey an email requesting that he resign as a moderator of the freecyclesunnyvale Yahoo! group. Oey Decl., Ex. OO. On the same date, Spencer sent an email to the owner and other moderators of the freecyclesunnyvale Yahoo! group attaching the email she had sent to Oey and stating TFN's hope that FreecycleSunnyvale remain part of TFN and asking that, if Oey did not remove himself as a moderator for the Yahoo! group, the group do so itself. Id. at Ex. PP. On September 23, 2005, Spencer sent an email to Oey and the other freecyclesunnyvale Yahoo! group moderators stating, "Having reached the deadline and not having received a reply from you, I have asked that the Sunnyvale link be removed from the Freecycle.org page." Id. at Ex. QQ.

On November 1, 2005, the owner of the freecyclesunnyvale Yahoo! group received a form email from TFN, stating that the group had been removed from www.freecycle.org "at the request of the Group Outreach and Assistance Coordinator for your region because your group is not currently set up in accordance with the basic requirements for all approved Freecycle (TM) groups which include, but are not limited to: items posted must be free, legal, and appropriate for all ages [and] the group must not be set to full moderation." Id. at Ex. RR. The email further stated,

> We have invested considerable time and resources in insuring that our organization is associated with only appropriately moderated, legal, and totally free services that have a common source of origin from The Freecycle Network (TM). This is why we only allow approved groups to associate with us in each community – to avoid any confusion among the public as [to] who they are dealing with when the Freecycle name is used. Accordingly, please consider this your official notice

12

> to stop using the trademark-protected Freecycle name and
> logo, as well as any and all copyrighted texts,
> graphics, rules, guidelines, title, or its URL (Yahoo
> group name).

Id. On November 21, 2005, at TFN's request, Yahoo! terminated the freecyclesunnyvale group. Oey declares that the Yahoo! group had approximately 2200 members when it was deleted. Id. at ¶ 71. On November 22, 2005, FreecycleSunnyvale created a new Yahoo! group named "sunnyvalefree." Oey declares that the new Yahoo! group had 782 members as of March 25, 2007.

On January 18, 2006, Plaintiff filed the initial complaint in this case, seeking declaratory judgment of non-infringement and damages for tortious interference with business relations. The Court granted in part Defendant's motion to dismiss, finding that Plaintiff failed to allege any basis for money damages. Plaintiff filed an amended complaint again seeking a declaration of non-infringement and also seeking an injunction prohibiting Defendant from interfering with FreecycleSunnyvale's business relations by disseminating false claims of trademark infringement. Defendant answered the amended complaint and brings counterclaims for trademark infringement and unfair competition under the Lanham Act and under California Business and Professions Code § 17200.

In April, 2006, TFN sued Oey in Arizona district court. TFN seeks "an injunction and damages, alleging that Oey's statements constituted contributory trademark infringement and trademark disparagement under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as injurious falsehood, defamation, and intentional interference with a business relationship under Arizona

13

law." <u>Oey</u>, 505 F.3d at 901.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir.

14

2000).

> The moving party may produce evidence negating an
> essential element of the nonmoving party's case, or,
> after suitable discovery, the moving party may show that
> the nonmoving party does not have enough evidence of an
> essential element of its claim or defense to carry its
> ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id.

15

This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

DISCUSSION

I. Naked Licensing

Plaintiff moves for summary judgment on the first claim for relief in its first amended complaint (FAC) for a declaration of non-infringement of Defendant's trademark, and on all of Defendant's counterclaims, based on its argument that Defendant abandoned the Freecycle trademark by entering into naked licenses. The Ninth Circuit defines naked licenses as those in which "the licensor fails to exercise adequate quality control over the licensee." Barcamerica Intern. USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 596 (9th Cir. 2002). In such situations, "a

16

court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." Id. (quoting Moore Bus. Forms, Inc. v. Ryu, 960 F.2d 486, 489 (5th Cir. 1992). "Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof." Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017 (9th Cir. 1982) (quoting Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir. 1976), cert. denied, 433 U.S. 908 (1977)). Further, "quality control does not necessarily mean that the licensed goods or services must be of high quality, but merely of equal quality, whether that quality is high, low or middle." Barcamerica, 289 F.3d at 596 (internal quotations omitted).

Plaintiff argues that when Defendant allowed it and many other groups to use the freecycle term and logo beginning in 2003, Defendant did not retain an express contractual right to control the quality of the groups' service, nor did it have meaningful quality control standards, and those standards that did exist were not enforced. First, Plaintiff notes that Defendant offered it the use of the logo with only one condition: "just don't use it for commercial purposes." Abraham Decl., Ex. C. Further, Plaintiff provides evidence that, until September, 2004, neither Beal nor any other representative of Defendant took any steps to screen groups before they used the logo or were listed on Defendant's freecycle.org website. Further, there is no evidence that Beal or any other representative of Defendant required any group to allow

17

monitoring or quality control as a condition of using the term or logo.

"There need not be formal quality control where the particular circumstances of the licensing arrangement indicate that the public will not be deceived." <u>Barcamerica</u>, 289 F.3d at 596. However, Plaintiff argues that nothing about its relationship with Defendant or the relationship between Defendant and numerous other freecycle groups provided for any sort of control to ensure that the public would receive the same level of service from every freecycle group.

Defendant counters that it has a variety of quality control standards sufficient to rebut Plaintiff's argument. First, Defendant points to its adoption in January, 2004 of the rule that all postings be "free, legal and appropriate for all ages." However, Defendant was allowing Plaintiff to use the term and logo for months before the "free, legal and appropriate for all ages" standard was adopted.[4] Further, Plaintiff presents evidence that the standard, which Beal described as the organization's "one true guiding principle," was neither strictly required of the individual groups nor uniformly applied. Abraham Decl., Ex. I. It was not until six months after the modsquad voted to approve the standard that Plaintiff included it in its rules and seven months after the vote that Plaintiff circulated the rule to its members. Further,

---

[4]Plaintiff provides evidence of earlier discussions regarding the posting of firearms and tobacco, in which Beal stated, "If you are going to allow gun/legal drug gifts, you better make sure that you have strong checks and balances in place." Abraham Decl., Ex. L. It is clear that when Plaintiff was given permission to use the term and logo, the "free, legal and appropriate for all ages" rule, later relied upon as Defendant's guiding principle, was not in place.

18

even though Beal clarified in an August 24, 2004 post to the
modsquad group that the standard "means no alcohol, tobacco,
firearms, pornography, drugs, etc," there is no evidence that this
rule was enforced. Oey Decl., Ex. O.

Plaintiff also provides evidence that each moderator was
permitted to come up with his or her own interpretation of the
standard. Although moderators were encouraged to use the modsquad
Yahoo! group as a way to discuss questions regarding standards and
practices, there was no control over either the suggestions made
within the modsquad group or whether or not the local groups abided
by the suggestions. Defendant did not exercise quality control
over the groups in this way.

Defendant next argues that its "rules and guidelines ensure a
consistent look, feel, and experience across all" groups and that
"[m]oderators have enforced these quality standards since October
13, 2003." Opposition at 12-13. Defendant cites several exhibits
in support of this argument. However, these documents do not
support a finding that Defendant controlled the quality of
Plaintiff's or other group's services when it began allowing them
to use the term and logo.

First, some of the documents cited are undated and contain a
footer that states, "Copyright 2003-2007." This suggests that the
documents were written in 2007, long after Defendant first allowed
Plaintiff and numerous others to use the term and logo. See, e.g.,
Kobialka Decl., Ex. 7 (document containing the "2003-2007" footer);
see also Kobialka Decl., Exs. 41, 42, 44 (undated documents).
Another document is a request for advice posted on the modsquad

19

group.  Kobialka Decl., Ex. 38.  That an individual, presumably a
group moderator, sought guidance from a group of other moderators
says nothing about any control that Defendant exercised over the
groups.

Still other documents make statements that sound like rules,
but were written by unidentified individuals.  For example, an
individual named Nikki McWhinney advised in a post on the modsquad
group that pirated copies of CDs and DVDs "are NOT legal and
therefore are NOT allowed on Freecycle . . . .  This is not
negotiable for ANY country, city or group."  Kobialka Decl., Ex.
50.  However, Defendant does not indicate that McWhinney was acting
on its behalf to maintain quality control or that compliance with
her interpretation of Defendant's rules was enforced.  Further, the
posting was made on March 11, 2007, well after the initial
permission to use the term and logo.  Similarly, the fact that Beal
shared his suggested version of an "etiquette" for his freecycle
group does not indicate that other groups were required to adopt
the same from the outset.  Kobialka Decl., Ex. 14.  In fact, there
is evidence that inclusion of certain parts of the etiquette was
not a requirement until September, 2004. Finally, those documents
that do contain clear guidance or rules were not posted until well
after Defendant granted Plaintiff permission to use the logo.
E.g., Kobialka Decl., Ex. 56 (posted October, 2006).

Defendant next points to its "incorporation" of Yahoo!'s
standards for Yahoo! groups as evidence of further consistency
among its groups.  However, Defendant presents no evidence
demonstrating that all freecycle groups were required to use Yahoo!

groups rather than any other service.  Further, the terms and conditions Defendant cites -- "prohibitions on impersonating others, stalking members, sending spam messages, or harassing others" -- cannot reasonably be interpreted to be quality control standards for freecycle services.  Similarly, the 2005 creation, by an individual named Emily, of the Penguin Patrol to monitor groups to identify those "that fail to comply with The Freecycle Netowrk's rules and etiquette, and especially its Trademark policy" is not enough to demonstrate that Defendant had quality control measures in place at the time it started allowing Plaintiff and other groups to use the term and logo.  As Plaintiff notes, Defendant's enforcement of its trademark policy is not relevant to whether it controlled the quality of the services provided by groups using the term and logo.

Finally, Defendant argues, "One of the most important quality standards The Freecycle Network upholds is the 'Freecycle Ethos.'" Beal declares as follows:

> From its inception, The Freecycle Network has cultivated and maintained a "Freecycle Ethos" among Freecycle groups that defines the types of interactions that occur within its group and the types of people who will participate in its groups.  The Freecycle Ethos involves cultivating a positive environment in which individuals are encouraged to act selflessly by giving to others without personal gain.  Part of the Freecycle Ethos includes decentralized, democratic leadership that allows regional groups to add some rules and procedures to fit the particular needs of their communities as long as the core rules and guidelines are followed.  The Freecycle Network's decisions are based in part upon input and polling of the volunteer moderators.  This "Freecycle Ethos" of "warm-fuzzy" feelings is an essential quality of Freecycle groups that The Freecycle Network has carefully regulated through various rules and policies.

Beal Decl. ¶ 9.  Defendant implies that Plaintiff mischaracterizes
this ethos as a lack of quality standards.  Rather, Defendant
argues that this ethos of local flexibility, together with what
Defendant characterizes as "policies and procedures" that are
"consistent from group to group," is itself an "important quality
standard."  Opposition at 14.  However, this argument relies on a
presumption of consistent policies and procedures.  As discussed
above, Defendant has not produced evidence demonstrating that any
policies and procedures were enforced in a meaningful way from the
time it started allowing Plaintiff and others to use the term and
logo.

Even though freecycle services are "relatively simple,"
Plaintiff provides evidence that there were no quality controls for
a significant number of groups at the time they were created and
for many months after they began operating.  Although Defendant has
since established quality controls, those controls came months
later and it is not clear that they have been strictly enforced.
Therefore, the Court finds that Defendant abandoned its control
over the term and logo when it allowed Plaintiff and others to use
them without exercising adequate quality control over the services
provided.

II.  Implied Contractual License

Defendant next argues that, although it did not explicitly
license local groups to use the freecycle term and logo, "it
granted implied licenses subject to adherence to the Freecycle
Network's policies and procedures."  Oppostion at 15.  Therefore,
Defendant argues, it retained "an implied contractual right to

22

inspect and supervise its member groups." _Id._

Defendant cites _Birthright v. Birthright, Inc._, 827 F. Supp. 1114 (D.N.J. 1993) to support this theory. However, naked licensing was not at issue in that case. In fact, the _Birthright_ court specifically stated that "although either naked licensing or licensing without reasonable control can work an abandonment, neither of these conditions exists in this case because defendants' use was subject to their compliance with the Birthright Charter and policy directives, as monitored and controlled by the Birthright Board." _Id._ at 1139-40 (internal quotations omitted). Unlike _Birthright_, where the court "found as fact that plaintiff monitored and controlled the use of the 'Birthright' name," Defendant has produced no evidence to rebut Plaintiff's argument and evidence that Defendant did not monitor or control the services associated with the use of the term and logo for close to a year after it first allowed Plaintiff and other groups to use them. _Cf. id._ at 1135.

III. Recapture

Finally, Defendant argues that even if it abandoned its marks in the past, it "has recaptured its rights in the Marks through the establishment of stringent quality control standards." Opposition at 24. However, even if Defendant at some point recaptured its rights to the marks, such recapture came after Plaintiff began using them. Therefore, Plaintiff's use would have priority over any rights Defendant regained. _See First Interstate Bancorp v. Stenquist_, 1990 WL 299251, at *3 (N.D. Cal.).

23

IV.  Effect of Naked Licensing

As discussed above, Defendant abandoned its marks when it allowed Plaintiff and other groups to use the term and logo without maintaining any quality control over the service those groups provided.  Therefore, the Court grants Plaintiff's motion for summary judgment with respect to its first claim for declaratory relief of non-infringement of trademarks.  At oral argument Defendant asserted that summary judgment is not appropriate because Plaintiff seeks a declaration that the marks are in fact generic.  However, the complaint clearly seeks two alternative declarations, one of which is a declaration that Plaintiff had a naked license to use the marks.[5]  FAC ¶¶ 45.

Plaintiff also argues that it is entitled to summary judgment on all of Defendant's counterclaims because they are premised upon a valid trademark.  Defendant's counterclaim for unfair competition based on the Lanham Act is based only on Plaintiff's use of the marks.  Therefore, based on the finding of naked licensing, the Court grants Plaintiff's motion for summary judgment with respect to this claim.

However, Defendant's trademark infringement and state unfair competition counterclaims also allege that Plaintiff has improperly induced others to misuse Defendant's marks.   Amended Answer and

---

[5]Because Plaintiff seeks this alternative declaration, the Court need not reach the question of whether granting Plaintiff's motion for summary judgment with respect to naked licensing strips Plaintiff of standing to pursue a declaration of invalidity.  The Court need not reach the question of the trademark's validity to resolve Plaintiff's declaratory relief claim.

24

Counterclaims ¶ 72, 76-79, 95-97.  As discussed above, Defendant argues that, even if it abandoned its rights to the marks, it has recaptured those rights through later controls.  Although Plaintiff's use of the marks is protected by its earlier naked license to use the term and logo, Defendant's counterclaims are not necessarily barred by this naked licensing to the extent they are based upon Plaintiff's later encouragement of others to use the marks in violation of any rights that Defendant might have reclaimed.  Therefore, the Court will not grant Plaintiff summary judgment on Defendant's trademark infringement and unfair competition counterclaims on this basis.

V.   Defendant's Trademark Infringement and State Unfair
     Competition Counterclaims

     In Oey, the Ninth Circuit held that, assuming TFN had a legitimate mark, Oey's encouragement of others to use the mark in a manner that might render it generic "was not likely to cause confusion, mistake, or deceive anyone as to the connection of Oey's services (or any other) with TFN." 505 F.3d at 903.  Therefore, these actions could not have been a violation of 15 U.S.C. § 1125(a)(1).  Further, the Oey court held that these actions "do not satisfy the requirements for false advertising, misrepresentation, or unfair competition under § 1125(a)(1)(B)" because there is "no evidence that Oey's statements were made in 'commercial advertising or promotion.'"  Id.  Therefore, the court held that the grant of a preliminary injunction against Oey based on a trademark infringement claim was not appropriate.  Id.

25

Defendant argues that, because Plaintiff's use of the mark was different from Oey's, the <u>Oey</u> decision does not require granting Plaintiff's motion. However, as discussed above, the naked license given to Plaintiff provides the basis for granting the motion with respect to Plaintiff's own use of the mark. The only remaining basis for Defendant's claims is Plaintiff's later encouragement of others to use the marks in a generic manner. This activity is analogous, if not identical to Oey's actions. Therefore, the Court also grants Plaintiff's motion for summary judgment with respect to Defendant's trademark infringement claim.

However, neither party has addressed whether such acts constitute a violation of California Business and Professions Code § 17200. Plaintiff argues that Defendant's § 17200 claim necessarily fails because its Lanham Act claims fail. However, the cases cited by Plaintiff involve situations in which there was no protectable trademark. Defendant has not addressed this claim in its papers. Although the <u>Oey</u> decision forecloses Defendant's argument that encouraging others to use a mark in a generic manner is prohibited under the Lanham Act, it does not address whether such activity constitutes unfair competition under California law.

VI.  Plaintiff's Tortious Interference Claim

Plaintiff argues in its supplemental motion that it is also entitled to summary judgment on its tortious interference with business relations claim. Defendant first argues that this issue is not properly before the Court because Plaintiff did not seek

summary judgment on the claim in its initial motion.  Plaintiff
counters that the Court should address the issue because the Ninth
Circuit's decision in <u>Oey</u> supports a grant of summary judgment in
its favor.  Because Defendant has had an opportunity to respond to
Plaintiff's argument and because the Ninth Circuit decision
provides further support for that argument, the Court will address
it.

In order to prevail on its tortious interference with business
relations claim, Plaintiff must demonstrate that (1) it had a valid
contract with a third party; (2) Defendant had knowledge of the
contract; (3) Defendant intentionally acted to induce a breach or
disruption of that contractual relationship; (4) the contract was
disrupted or breached; and (5) Plaintiff suffered damages.  <u>Pac.
Gas & Elec. Co. v. Bear Stearns & Co.</u>, 50 Cal. 3d 1118, 1126
(1990).  Plaintiff's claim is based on its allegation that
Defendant requested that Yahoo! terminate the freecyclesunnyvale
Yahoo! group.  Defendant argues that there are triable issues of
fact with respect to the second and fifth elements and its
affirmative defense of privilege.

Defendant argues that there is no evidence that it was aware
that Plaintiff existed.  Therefore, Defendant contends, there
remains a question of fact whether it could have had knowledge of a
contract between Plaintiff and Yahoo!  However, there is evidence
that, on November 21, 2005, Defendant's trademark agent Sarah
Blouin contacted Yahoo!, stating that she had a good faith belief

27

that the freecyclesunnyvale Yahoo! group was infringing Defendant's protectable trademark rights and requesting that Yahoo! terminate the freecyclesunnyvale group.  Evans Decl., Ex. C.  As Plaintiff notes, it is clear that Defendant was aware that a contract existed between Yahoo! and some entity.  Moreover, there is evidence that Defendant had been in communication with Oey and other freecyclesunnyvale Yahoo! group moderators in the weeks leading up to its request that Yahoo! terminate the Yahoo! group.  That Defendant was unaware of the fact that Plaintiff considers itself an unincorporated organization called FreecycleSunnyvale is not enough to refute Defendant's knowledge of the entity and its contract.

Defendant next argues that there is a triable question of fact whether Plaintiff was damaged by Defendant's actions.  Defendant first contends that Abraham and Oey's deposition testimony regarding the loss of members when the Yahoo! group was terminated is not consistent.  However, as Plaintiff notes, there is nothing inconsistent between Abraham's testimony that Plaintiff lost "hundreds" of members and Oey's testimony that, as of the date of his August, 2007 deposition, the new sunnyvalefree Yahoo! group had about 800 members.  As stated above, Oey also declared that the freecyclesunnyvale Yahoo! group had approximately 2200 members when it was terminated.  The difference between 2200 and 800 is accurately described as "hundreds."  Next, Defendant notes inconsistencies in testimony regarding the length of time between

the termination of the freecyclesunnyvale Yahoo! group and the creation of the sunnyvalefree Yahoo! group. However, this fact is relevant only to the extent of damages suffered. Plaintiff has abandoned its claim for money damages. Therefore, the extent of its damages is no longer relevant.

Finally, Defendant cites <u>Richardson v. La Rancherita</u> in support of its argument that it had "sufficient justification" for asking Yahoo! to terminate the freecyclesunnyvale Yahoo! group. 98 Cal. App. 3d 73, 80 (1979). In <u>Richardson</u>, the California Court of Appeal held that a defendant's interference with a plaintiff's contract is privileged if "(1) he has a legally protected interest, (2) in good faith threatens to protect it, and (3) the threat is to protect it by appropriate means." <u>Id.</u> at 81. Here, there is a triable question of fact whether Defendant acted in good faith when it asked Yahoo! to terminate the freecyclesunnyvale Yahoo! group. Although the Court now finds that Defendant did not have a legally protected interest in the mark as to Plaintiff, the law is not clear whether a good faith belief that Defendant had a legally protected interest is sufficient to afford this protection. <u>See</u> <u>McReynolds v. Short</u>, 564 P.2d 389, 394 (Ariz. 1977) (interference justified where defendant "honestly believed" he had a legally protected interest); Restatement (Second) of Torts § 773.

Therefore, the Court denies Plaintiff's motion for summary judgment with respect to its tortious interference claim.

CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART Plaintiff's motion for partial summary judgment and supplemental

1  motion for summary judgment and DENIES THEM IN PART (Docket Nos.

2  76, 131).[6]

3      IT IS SO ORDERED.

4  Dated:  3/13/08                    _____

5                                     CLAUDIA WILKEN
                                      United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

_____

25     [6]Defendant has filed a motion to strike the declaration of
   Miles Robertson filed by Plaintiff in support of its motion for
26  summary adjudication.  The Court did not rely upon that declaration
   in deciding this motion.  Defendant's motion to strike is GRANTED
27  (Docket No. 101).

28
                                30