1  PAUL J. ANDRE, Bar No. 196585
   (pandre@kslaw.com)
2  LISA KOBIALKA, Bar No. 191404
   (lkobialka@kslaw.com)
3  SEAN M. BOYLE, Bar No. 238128
   (sboyle@kslaw.com)
4  KING & SPALDING
   1000 Bridge Parkway, Suite 100
5  Redwood City, CA 94065

6  Attorneys for Defendant
   The Freecycle Network, Inc.

**FILED**

JUN - 3 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
DISTRICT OF CALIFORNIA
OAKLAND

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

|  |  |
|---|---|
| FREECYCLESUNNYVALE, a California unincorporated association, | CASE NO. C 06-00324 CW |
|  | **NOTICE OF APPEAL** |
| Plaintiff, |  |
| v. |  |
| THE FREECYCLE NETWORK, INC., an Arizona corporation, |  |
| Defendant. |  |
| THE FREECYCLE NETWORK, INC., an Arizona corporation, |  |
| Counterclaimant, |  |
| v. |  |
| FREECYCLESUNNYVALE, a California unincorporated association, |  |
| Counterdefendant. |  |

THE FREECYCLE NETWORK, INC.'S                    CASE NO. C 06-00324 CW
NOTICE OF APPEAL

1

1    The Freecycle Network, the defendant, appeals to the United States Court of Appeal for the Ninth

2    Circuit from the order of the district court granting in part plaintiff's motion for summary judgment and

3    denying it in part and granting defendant's motion to strike, entered in this case on, March 13, 2008.

4    Attached hereto as Exhibit A is a copy of the district court's order granting in part plaintiff's motion for

5    summary judgment and denying it in part and granting defendant's motion to strike.

6

7    DATED: June 3, 2008                              KING & SPALDING

8

9                                                    By _____
                                                        Paul Andre
10                                                      Lisa Kobialka
                                                        Attorneys for The Freecycle Network, Inc.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE FREECYCLE NETWORK, INC.'S                              CASE NO. C 06-00324 CW
NOTICE OF APPEAL

2

EXHIBIT A

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREECYCLESUNNYVALE, a California unincorporated association, | No. C 06-00324 CW |
| Plaintiff/Counterclaim Defendant, | |
| v. | ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING IT IN PART AND GRANTING DEFENDANT'S MOTION TO STRIKE |
| THE FREECYCLE NETWORK, INC., an Arizona corporation, | |
| Defendant/Counterclaimant. | |

_____/

Plaintiff and Counterclaim-Defendant FreecycleSunnyvale filed a motion for partial summary judgment. Defendant and Counterclaimant The Freecycle Network (TFN), Inc. opposed the motion and moved to strike a declaration filed in support of Plaintiff's motion. The motions were heard on September 27, 2007. At the hearing, Plaintiff argued that the Ninth Circuit's recent opinion in The Freecycle Network, Inc. v. Oey, 505 F.3d 898 (9th Cir. 2007), entitled it to summary judgment on all claims and

1  counterclaims.  The Court requested additional briefing on the
2  issue.  Plaintiff has now filed a supplemental motion for summary
3  judgment, which Defendant opposes.  Having considered all of the
4  parties' papers and oral argument on the motions, the Court grants
5  in part Plaintiff's motion for summary judgment and denies it in
6  part and grants Defendant's motion to strike.

7                          BACKGROUND

8       In this case, Plaintiff brings claims for declaratory judgment
9  of non-infringement of trademarks and tortious interference with
10  business relations.  Defendant brings counterclaims for trademark
11  infringement and unfair competition under the Lanham Act and unfair
12  competition under California Business and Professions Code § 17200.

13      As set out more fully in the Court's earlier orders, Plaintiff
14  is a non-profit organization with its principal place of business
15  in Sunnyvale, California.  Defendant is an Arizona non-profit
16  organization with its principal place of business in Tuscon,
17  Arizona.  Its purpose is to promote recycling by providing support
18  and acting as a central organizing point for local community-based
19  recycling efforts throughout the United States and abroad.
20  Defendant alleges that it "is the sole owner of the inherently
21  distinctive and famous trademarks 'FREECYCLE' and 'The Freecycle
22  Network,' and the inherently distinctive 'The Freecycle Network'
23  logo (collectively referred to as the 'Marks'), which it has been
24  using exclusively and continuously since at least May 1, 2003."
25  Amended Counterclaims ¶ 67.

26      On October 3, 2003, Lisanne Abraham received an email from her
27  friend Albert Kaufman who owned and moderated a "Freecycle" email

28                                2

United States District Court
For the Northern District of California

1 group in Portland, Oregon.  In the email Kaufman discussed his
2 discovery of a group called Freecycle Tuscon, his experience in
3 setting up Freecycle Portland and encouraged his friends to "Join
4 the Freecycle Revolution."  Abraham Decl., Ex. A at 1.

5    Abraham was interested in the idea and contacted Kaufman for
6 advice on how to do so.  Kaufman replied, "Just create it and join
7 the revolution.  I'm glad to help you spread the word, and
8 www.freecycle.org is a great place to get resources, too."  Abraham
9 Decl., Ex. B.  Abraham created a Yahoo! group[1] named
10 freecyclesunnyvale.  She declares that she used the etiquette
11 guidelines she found on the main page of either Kaufman's Yahoo!
12 group or the Yahoo! group of Defendant's founder and later
13 executive director, Deron Beal.  She states that she "lightly
14 edited the instructions, so [hers] were very similar to the other
15 two groups' but not verbatim."  Abraham Decl. ¶ 11.  The etiquette
16 guidelines Abraham included were,

17    Welcome to the Sunnyvale Freecycle Network!

18    To post a message to members of this group, send an
      email to freecyclesunnyvale@yahoogroups.com
19
      FREECYCLING ETIQUETTE
20    1) NO POLITICS & NO SPAM.  Two strikes & you're out.
      2) SUBJECT LINE
21        Use these phrases:
          OFFER:
22        TAKEN:

23
      _____
24    [1]Yahoo! groups is a free service offering, among other things,
      email mailing lists, photo and file sharing and group calendars.
25    See http://groups.yahoo.com/.  Each Yahoo! group has a webpage
      where members can see information about other members, messages
26    posted to the group and the photos and files that have been shared.
      The Court refers to this page as the "main page" for the Yahoo!
27    group.

28                        3

```
        WANTED: [Use sparingly]
        ADMIN: [Use for new idea specifically related to
             freecycling.]
     3) RESPONSES go only to offeror (not to whole group)
     4) PICKUP of items: Arrange however you want.  Generally
     1st response, 1st served; if a nonprofit/charity
     responds, you may want to give it first shot.
     5) CAN WE USE FREECYCLE TO FIND NEW HOMES FOR PETS?
     Yes, keep it legal & be lovingly careful
     6) KEEP IT FREE.  No trading or bartering, please.
     To unsubscribe, send an email to
     freecyclesunnyvale-unsubscribe@yahoogroups.com
     Have fun & keep on freecyclin' . . .
```

Id. at ¶ 11 (bracketed material in original).

Abraham informed Kaufman that she had created the group and asked him where to get a logo.  Kaufman advised her to "send Deron the URL so we can make sure it joins the others on www.freecycle.org, and Mark [Messinger][2] may be willing to help you out with a funky logo.  Or, I can just send you the font people are using, or you can just create something in photo shop or use this picture."  Id.

Abraham declares that she emailed Beal and Messinger and spoke with Beal by telephone but does not state the content of those conversations.  On October 9, 2003, Beal sent Abraham an email stating, "You can get the neutral logo from http://www.freecycle.org, just don't use it for commercial purpose or you [sic] maybe Mark or Albert can help you to do your own fancy schmancy logo!"  Abraham Decl., Ex. C.  Messinger responded that he could create a logo for FreecycleSunnyvale and gave her several options regarding the design.  In his email attaching the image, Messinger concluded, "Good luck with the Sunnyvale Freecycling

---

[2]In a later email to Abraham, Messinger identified himself as the "Olympia Freecycling Moderator."  See Abraham Decl., Ex. D.

4

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1 group" and signed the message "Olympia Freecycling Moderator."
2 Abraham Decl., Ex. D. The logo Messinger created was substantially
3 similar to the image he created for the Portland group and the
4 image at issue in this case. Abraham further declares that around
5 the same time, FreecycleSunnyvale was added to the list of groups
6 on www.freecycle.org, enabling visitors to that website to click a
7 link and be directed to her Yahoo! group main page.

8     On October 9, 2003, Beal also sent an email to the moderators
9 of nineteen freecycle Yahoo! groups, welcoming the moderators to
10 "the Freecycle Network." Abraham Decl., Ex. E. Beal indicated
11 that he was including all of the existing freecycle Yahoo! group
12 moderators, so they could contact one another "for ideas and
13 input." Id. He also encouraged the moderators "to check out the
14 various cool logo designs" and noted, "Portland even has the
15 totally underground t-shirts available." Id. Beal raised the idea
16 of creating a separate Yahoo! group for all of the group moderators
17 to share ideas. The email did not include any restrictions or
18 guidance on the use of the term freecycle or the freecycle logo.
19 Beal signed the email, "Keep on Freecyclin'." Id.

20     On October 13, 2003, Abraham received an email invitation to
21 join the "freecyclemodsquad" Yahoo! group (modsquad group) for
22 moderators of freecycle Yahoo! groups. Id. at Ex. F. Abraham
23 joined the group and declares, "[I] read the email exchanges for a
24 month or two" but after that time, "the volume of email was so high
25 that I didn't regularly read the messages, although for several
26 months I saved the emails to an electronic folder." Id. at ¶ 6.
27 Abraham declares that by the end of February, 2004 she stopped

28                                   5

1  reading or saving the emails from the group.

2      On January 4, 2004, Beal sent an email to the modsquad Yahoo!
3  group, raising the question of "whether or not we should allow ALL
4  legal items." Id. at Ex. G.  Beal stated, "I believe we all need
5  to decide this issue together as a group, whether or not we, The
6  Freecycle Network, want to make a restriction here." Id.  Beal
7  further noted that the phrase, "Keep it Free, Legal & Appropriate
8  For All Ages" appeared in the etiquette section of the
9  freecycle.org website and asked "that all moderators vote on
10 whether they feel this is the one rule that should apply to ALL
11 local groups or not." Id.  In a follow-up email, Beal emphasized
12 that he was polling the group because he wanted them to make the
13 decision together.  Again, he signed the email, "Keep on
14 Freecyclin'" and indicated his affiliation with "RISE, The
15 Freecycle Network, A private, nonprofit freecycling, recycling &
16 transitional employment provider." Abraham Decl., Ex. H.

17     A majority of the modsquad Yahoo! group members voted in the
18 affirmative to the question, "Do you believe we should require that
19 all local groups have the rule 'Keep it Free, Legal & Appropriate
20 For All Ages?'" Id. at Ex. I.  On January 11, 2004, Beal informed
21 the group, "I'm glad to say we were actually able to decide, by a
22 large majority, that we now have one true guiding principle." Id.

23     Although the members of the modsquad agreed to the "Keep it
24 Free, Legal & Appropriate For All Ages" rule in January, 2004,
25 there is no evidence that individual groups were required to adopt
26 the rule at that time.  FreecycleSunnyvale did not add the rule to
27 its etiquette until June, 2004 and did not email it to the

28                                     6

United States District Court
For the Northern District of California

1    freecyclesunnyvale Yahoo! group members until July, 2004.

2        Moderators continued to post questions to the modsquad Yahoo!
3    group and to receive feedback from other moderators.  A frequent
4    topic of discussion was the actual definition of "free, legal and
5    appropriate for all ages."  Beal participated in many of these
6    conversations, with a general theme of encouraging local control
7    over each of the freecycle groups.

8        Beal declares that in early 2004, his organization, Defendant
9    TFN, created an intellectual property working group "tasked with
10   developing guidelines for protecting The Freecycle Network's
11   intellectual property, including The Freecycle Network's marks."
12   Beal Decl. ¶ 25.  Beal further declares that Defendant "requires
13   all its members to abide by The Freecycle Network Trademark
14   policy."  Id. at ¶ 26.  However, as discussed below, there is no
15   evidence of the creation of that working group in 2004 or of any
16   policy or directives regarding trademarks until January, 2005.  See
17   Oey Decl., Ex. CC.

18       Tim Oey became the lead volunteer moderator of the
19   freecyclesunnyvale Yahoo! group[3] and a member of what Beal
20   considered to be the "management/leadership team/crew/council."
21   Id. at Ex. X.  Oey declares that he became aware that Defendant
22   "wanted to protect a trademark on the word 'freecycle'" sometime in
23   September, 2004.  Id. at ¶ 39.  On September 16, 2004, Oey sent a
24   message to the modsquad Yahoo! group suggesting that the group

25

26       [3]At her deposition, Abraham stated that Oey became a co-
     moderator about four months after she started the
27   freecyclesunnyvale Yahoo! group.  Kobialka Decl., Ex. 11 at 87.

28                                    7

United States District Court
For the Northern District of California

1   begin to consider "intellectual property issues" because "the
2   Freecycle Network is growing up."  Beal Decl., Ex. 44.  In that
3   email, Oey warned,

4         Everyone in the Freecycle network needs to protect the
            "Freecycle" trademark.  Not only must trademarks be
5         actively defended (as Deron is doing), they must also
            be used properly.  Trademarks are adjectives, and must
6         only be used as such . . . .  Marks should never be
            used as nouns or verbs, nor should marks be pluralized
7         or used in the possessive form.  This is especially
            important in official Freecycle communications--web
8         sites, autosent emails, etc.  Unfortunately this does
            crimp the use of "Keep on Freecyclin'"--catchy, but
9         risky.

10  Id.  Oey also inquired, "What is the official name of the Freecycle
11  non-profit?" and suggested that the group "come up with some sort
12  of concise copyright policy for everyone to use that references the
13  official full Freecycle name."  Id.  He recommended that the
14  copyright include "a simple mini-license" that would allow groups
15  to "re-use, edit, extract, redistribute, and update" materials "as
16  long as this copyright statement is retained."  Id.  However, Oey
17  declares that, to his knowledge, Defendant did not take any steps
18  toward creating a trademark policy at that time.

19        During this period Defendant continued to create various teams
20  composed of volunteers that communicated via email to discuss
21  issues related to the growth of the freecycle network.  For
22  example, in September, 2004, Beal developed requirements for new
23  groups and organized a New Group Approvers (NGA) group, which
24  reviewed new groups before listing them on www.freecycle.org, and a
25  Group Outreach and Assistance group, which handled complaints about
26  various groups.  Neither of these groups screened existing groups
27  using the term freecycle or the freecycle logo or monitored

28                                        8

existing or new groups.  Between September, 2004 and September,
2005, Defendant required any new group to allow Defendant to
include a fictional co-owner created and controlled by Defendant.
Defendant stopped enforcing this requirement in September, 2005.
There is evidence that the NGAs did not consistently apply
Defendant's standards.  Oey was the NGA for California.

Oey continued to raise questions and concerns related to
Defendant's trademark claim to the term "freecycle."  However,
explicit in his communications regarding a potential trademark was
Oey's question of whether Defendant actually wanted to protect the
term.  For example, on November 8, 2004, Oey sent an email to the
New Webpage Planning Team (NWPT) stating that "we are already close
to losing the rights to the Freecycle mark," proposing a rule for
Beal to send to all moderators to enforce with their groups and
asking other members of the NWPT for their comments.  Oey Decl.,
Ex. AA.  The next day Oey sent another email to the group stating,

> Should we protect the mark "Freecycle" or let it become
> a generic term?  If we protect it we can prevent rogue
> groups from using it and have the term mean a certain
> level of quality in the service.  But this will require
> a bit of work on everyone's part.  If we let it become a
> new generic term, it can go into dictionaries, can be
> used by everyone, spreads the movement even further, and
> no one can prevent anyone from being able to use the
> term.  This will require no extra work as we are already
> on this path.  Which do we want?  Deron has said he
> wants to protect it but also expressed reluctance at
> trying to convince moderators to help protect it.  I
> think most moderators will understand but inevitably
> some will think this is yet another "rule" that is too
> much work.  If we take action now we can probably save
> the mark, if not it will become generic.

Id.

On January 5, 2005, Beal sent an email to the modsquad

1   instructing that "anything official should never use the word
2   'Freecycle' as anything but an adjective" and that the term "always
3   needs to be capitalized."  Id. at Ex. CC.  Oey declares that during
4   January, 2005, he "was the primary author for [Defendant] TFN's
5   trademark policies" and that it was not until February, 2005 that
6   he "first became aware that TFN was attempting to enforce a
7   trademark policy by controlling how freecycling groups could use
8   the word 'freecycle.'"  Id. at ¶¶ 47, 48.

9        On February 7, 2005, an individual named Emily invited various
10  moderators including Oey to join the Penguin Patrol, a group she
11  was forming "to cover: rogue group pursuit . . . , database work
12  . . ., Trademark policy & support . . ., Safety concerns . . .
13  [and] General sleuthing."  Id. at Exh. DD.  Emily emphasized that
14  the group was not to be open to the public or to all moderators and
15  that the information discussed within the group was not to be
16  assumed to be common knowledge.  Among the tasks outlined for the
17  group were sending cease and desist letters to "rogue groups" and
18  establishing a policy on trademark and copyright issues.  Id.

19       Oey was a member of the Penguin Patrol and declares that from
20  "February 2005 to May 2005, [he] helped people with trademark
21  issues."  Id. at ¶ 48-49.  However, in March, 2005, Oey "began to
22  have doubts about [his] earlier decision to support TFN's pursuit
23  of trademark rights in the word 'freecycle.'"  Id. at ¶ 50.  These
24  doubts stemmed from an email posted to the freecyclesunnyvale
25  Yahoo! group that suggested that the effort to trademark the word
26  "freecycle" conflicted with the anti-corporate spirit of the
27  group's concept.  See id. at Ex. EE.  Nonetheless, Oey "chose at

28                                  10

1  that time to continue to publicly support TFN's pursuit of
2  trademark rights."  Id. at ¶ 51.  However, he noted that between
3  January and August, 2005, "TFN steadily lost a number of
4  volunteers" and it was his understanding that "many of these
5  volunteers left over TFN's decision to pursue trademark rights in
6  the word 'freecycle' and TFN's treatment of local freecycling
7  groups."  Id. at ¶ 52.  By May, 2005, Oey had resigned from all of
8  his "senior TFN volunteer roles" but stayed on as the moderator of
9  the freecyclesunnyvale Yahoo! group.  Id. at ¶ 55.

10      In August, 2005, "a large group of very active volunteers
11  . . . left TFN suddenly."  Id. ¶ 64.  Oey believes that "these
12  individuals left TFN because of TFN's trademark policies and
13  treatment of local freecycling groups."  Id.  When Oey learned of
14  these departures, he sent an email to the modsquad stating his
15  belief that there were "two reasonable paths for Freecycle."
16  Id. at Ex. MM.  One of these paths, Oey described as "the
17  traditional corporate style path" and the other, he described as
18  the "one where freecycle goes back to its roots, lets go, and
19  becomes, again, a true, open, grassroots movement."  Id.  The
20  second path, which Oey advocated, involved abandoning "the
21  Freecycle trademark pursuit."  Id.  As described by the Ninth
22  Circuit,

23          In the following weeks, Oey made various statements on
            the Internet that TFN lacked trademark rights in
24          'freecycle' because it was a generic term, and he
            encouraged others to use the term in its generic sense
25          and to write letters to the United States Patent and
            Trademark Office ("PTO") opposing TFN's pending
26          registration.

27  Oey, 505 F.3d at 901.

28                              11

1    On September 16, 2005, Paula Spencer, the TFN California Group
2  Outreach and Assistance Team Member, sent Oey an email requesting
3  that he resign as a moderator of the freecyclesunnyvale Yahoo!
4  group.  Oey Decl., Ex. OO.  On the same date, Spencer sent an email
5  to the owner and other moderators of the freecyclesunnyvale Yahoo!
6  group attaching the email she had sent to Oey and stating TFN's
7  hope that FreecycleSunnyvale remain part of TFN and asking that, if
8  Oey did not remove himself as a moderator for the Yahoo! group, the
9  group do so itself.  Id. at Ex. PP.  On September 23, 2005, Spencer
10 sent an email to Oey and the other freecyclesunnyvale Yahoo! group
11 moderators stating, "Having reached the deadline and not having
12 received a reply from you, I have asked that the Sunnyvale link be
13 removed from the Freecycle.org page."  Id. at Ex. QQ.

14    On November 1, 2005, the owner of the freecyclesunnyvale
15 Yahoo! group received a form email from TFN, stating that the group
16 had been removed from www.freecycle.org "at the request of the
17 Group Outreach and Assistance Coordinator for your region because
18 your group is not currently set up in accordance with the basic
19 requirements for all approved Freecycle (TM) groups which include,
20 but are not limited to: items posted must be free, legal, and
21 appropriate for all ages [and] the group must not be set to full
22 moderation."  Id. at Ex. RR.  The email further stated,

23       We have invested considerable time and resources in
         insuring that our organization is associated with only
24       appropriately moderated, legal, and totally free
         services that have a common source of origin from The
25       Freecycle Network (TM).  This is why we only allow
         approved groups to associate with us in each community –
26       to avoid any confusion among the public as [to] who they
         are dealing with when the Freecycle name is used.
27       Accordingly, please consider this your official notice

28                                12

United States District Court
For the Northern District of California

1
2
3

to stop using the trademark-protected Freecycle name and logo, as well as any and all copyrighted texts, graphics, rules, guidelines, title, or its URL (Yahoo group name).

4  Id.  On November 21, 2005, at TFN's request, Yahoo! terminated the
5  freecyclesunnyvale group.  Oey declares that the Yahoo! group had
6  approximately 2200 members when it was deleted.  Id. at ¶ 71.  On
7  November 22, 2005, FreecycleSunnyvale created a new Yahoo! group
8  named "sunnyvalefree."  Oey declares that the new Yahoo! group had
9  782 members as of March 25, 2007.

10       On January 18, 2006, Plaintiff filed the initial complaint in
11  this case, seeking declaratory judgment of non-infringement and
12  damages for tortious interference with business relations.  The
13  Court granted in part Defendant's motion to dismiss, finding that
14  Plaintiff failed to allege any basis for money damages.  Plaintiff
15  filed an amended complaint again seeking a declaration of non-
16  infringement and also seeking an injunction prohibiting Defendant
17  from interfering with FreecycleSunnyvale's business relations by
18  disseminating false claims of trademark infringement.  Defendant
19  answered the amended complaint and brings counterclaims for
20  trademark infringement and unfair competition under the Lanham Act
21  and under California Business and Professions Code § 17200.

22       In April, 2006, TFN sued Oey in Arizona district court.  TFN
23  seeks "an injunction and damages, alleging that Oey's statements
24  constituted contributory trademark infringement and trademark
25  disparagement under section 43(a) of the Lanham Act, 15 U.S.C.
26  § 1125(a), as well as injurious falsehood, defamation, and
27  intentional interference with a business relationship under Arizona

28                                  13

1    law."  Oey, 505 F.3d at 901.

2                              LEGAL STANDARD

3         Summary judgment is properly granted when no genuine and

4    disputed issues of material fact remain, and when, viewing the

5    evidence most favorably to the non-moving party, the movant is

6    clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

7    56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

8    Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

9    1987).

10        The moving party bears the burden of showing that there is no

11   material factual dispute.  Therefore, the court must regard as true

12   the opposing party's evidence, if supported by affidavits or other

13   evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

14   F.2d at 1289.  The court must draw all reasonable inferences in

15   favor of the party against whom summary judgment is sought.

16   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

17   587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

18   1551, 1558 (9th Cir. 1991).

19        Material facts which would preclude entry of summary judgment

20   are those which, under applicable substantive law, may affect the

21   outcome of the case.  The substantive law will identify which facts

22   are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23   (1986).

24        Where the moving party does not bear the burden of proof on an

25   issue at trial, the moving party may discharge its burden of

26   production by either of two methods.  Nissan Fire & Marine Ins.

27   Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir.

28                                    14

United States District Court
For the Northern District of California

1 2000).

2      The moving party may produce evidence negating an
       essential element of the nonmoving party's case, or,
3      after suitable discovery, the moving party may show that
       the nonmoving party does not have enough evidence of an
4      essential element of its claim or defense to carry its
       ultimate burden of persuasion at trial.
5

Id.
6

7      If the moving party discharges its burden by showing an

8 absence of evidence to support an essential element of a claim or

9 defense, it is not required to produce evidence showing the absence

10 of a material fact on such issues, or to support its motion with

11 evidence negating the non-moving party's claim.  Id.; see also

12 Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v.

13 NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the

14 moving party shows an absence of evidence to support the non-moving

15 party's case, the burden then shifts to the non-moving party to

16 produce "specific evidence, through affidavits or admissible

17 discovery material, to show that the dispute exists."  Bhan, 929

18 F.2d at 1409.

19     If the moving party discharges its burden by negating an

20 essential element of the non-moving party's claim or defense, it

21 must produce affirmative evidence of such negation.  Nissan, 210

22 F.3d at 1105.  If the moving party produces such evidence, the

23 burden then shifts to the non-moving party to produce specific

24 evidence to show that a dispute of material fact exists.  Id.

25     If the moving party does not meet its initial burden of

26 production by either method, the non-moving party is under no

27 obligation to offer any evidence in support of its opposition.  Id.

28
                                   15

United States District Court
For the Northern District of California

1  This is true even though the non-moving party bears the ultimate
2  burden of persuasion at trial.  Id. at 1107.

3       Where the moving party bears the burden of proof on an issue
4  at trial, it must, in order to discharge its burden of showing that
5  no genuine issue of material fact remains, make a prima facie
6  showing in support of its position on that issue.  UA Local 343 v.
7  Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That
8  is, the moving party must present evidence that, if uncontroverted
9  at trial, would entitle it to prevail on that issue.  Id.; see also
10  Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th
11  Cir. 1991).  Once it has done so, the non-moving party must set
12  forth specific facts controverting the moving party's prima facie
13  case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's
14  "burden of contradicting [the moving party's] evidence is not
15  negligible."  Id.  This standard does not change merely because
16  resolution of the relevant issue is "highly fact specific."  Id.
17                              DISCUSSION
18  I.   Naked Licensing

19       Plaintiff moves for summary judgment on the first claim for
20  relief in its first amended complaint (FAC) for a declaration of
21  non-infringement of Defendant's trademark, and on all of
22  Defendant's counterclaims, based on its argument that Defendant
23  abandoned the Freecycle trademark by entering into naked licenses.
24  The Ninth Circuit defines naked licenses as those in which "the
25  licensor fails to exercise adequate quality control over the
26  licensee."  Barcamerica Intern. USA Trust v. Tyfield Importers,
27  Inc., 289 F.3d 589, 596 (9th Cir. 2002).  In such situations, "a

28                                 16

United States District Court
For the Northern District of California

1    court may find that the trademark owner has abandoned the

2    trademark, in which case the owner would be estopped from asserting

3    rights to the trademark." Id. (quoting Moore Bus. Forms, Inc. v.

4    Ryu, 960 F.2d 486, 489 (5th Cir. 1992). "Because a finding of

5    insufficient control essentially works a forfeiture, a person who

6    asserts insufficient control must meet a high burden of proof."

7    Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1017

8    (9th Cir. 1982) (quoting Edwin K. Williams & Co., Inc. v. Edwin K.

9    Williams & Co.-East, 542 F.2d 1053, 1059 (9th Cir. 1976), cert.

10   denied, 433 U.S. 908 (1977)). Further, "quality control does not

11   necessarily mean that the licensed goods or services must be of

12   high quality, but merely of equal quality, whether that quality is

13   high, low or middle." Barcamerica, 289 F.3d at 596 (internal

14   quotations omitted).

15      Plaintiff argues that when Defendant allowed it and many other

16   groups to use the freecycle term and logo beginning in 2003,

17   Defendant did not retain an express contractual right to control

18   the quality of the groups' service, nor did it have meaningful

19   quality control standards, and those standards that did exist were

20   not enforced. First, Plaintiff notes that Defendant offered it the

21   use of the logo with only one condition: "just don't use it for

22   commercial purposes." Abraham Decl., Ex. C. Further, Plaintiff

23   provides evidence that, until September, 2004, neither Beal nor any

24   other representative of Defendant took any steps to screen groups

25   before they used the logo or were listed on Defendant's

26   freecycle.org website. Further, there is no evidence that Beal or

27   any other representative of Defendant required any group to allow

28

17

1  monitoring or quality control as a condition of using the term or
2  logo.

3      "There need not be formal quality control where the particular
4  circumstances of the licensing arrangement indicate that the public
5  will not be deceived."  Barcamerica, 289 F.3d at 596.  However,
6  Plaintiff argues that nothing about its relationship with Defendant
7  or the relationship between Defendant and numerous other freecycle
8  groups provided for any sort of control to ensure that the public
9  would receive the same level of service from every freecycle group.
10     Defendant counters that it has a variety of quality control
11  standards sufficient to rebut Plaintiff's argument.  First,
12  Defendant points to its adoption in January, 2004 of the rule that
13  all postings be "free, legal and appropriate for all ages."
14  However, Defendant was allowing Plaintiff to use the term and logo
15  for months before the "free, legal and appropriate for all ages"
16  standard was adopted.[4]  Further, Plaintiff presents evidence that
17  the standard, which Beal described as the organization's "one true
18  guiding principle," was neither strictly required of the individual
19  groups nor uniformly applied.  Abraham Decl., Ex. I.  It was not
20  until six months after the modsquad voted to approve the standard
21  that Plaintiff included it in its rules and seven months after the
22  vote that Plaintiff circulated the rule to its members.  Further,
23

24      [4]Plaintiff provides evidence of earlier discussions regarding
    the posting of firearms and tobacco, in which Beal stated, "If you
25  are going to allow gun/legal drug gifts, you better make sure that
    you have strong checks and balances in place."  Abraham Decl., Ex.
26  L.  It is clear that when Plaintiff was given permission to use the
    term and logo, the "free, legal and appropriate for all ages" rule,
27  later relied upon as Defendant's guiding principle, was not in
    place.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  even though Beal clarified in an August 24, 2004 post to the
2  modsquad group that the standard "means no alcohol, tobacco,
3  firearms, pornography, drugs, etc," there is no evidence that this
4  rule was enforced.  Oey Decl., Ex. O.

5     Plaintiff also provides evidence that each moderator was
6  permitted to come up with his or her own interpretation of the
7  standard.  Although moderators were encouraged to use the modsquad
8  Yahoo! group as a way to discuss questions regarding standards and
9  practices, there was no control over either the suggestions made
10 within the modsquad group or whether or not the local groups abided
11 by the suggestions.  Defendant did not exercise quality control
12 over the groups in this way.

13     Defendant next argues that its "rules and guidelines ensure a
14 consistent look, feel, and experience across all" groups and that
15 "[m]oderators have enforced these quality standards since October
16 13, 2003."  Opposition at 12-13.  Defendant cites several exhibits
17 in support of this argument.  However, these documents do not
18 support a finding that Defendant controlled the quality of
19 Plaintiff's or other group's services when it began allowing them
20 to use the term and logo.

21     First, some of the documents cited are undated and contain a
22 footer that states, "Copyright 2003-2007."  This suggests that the
23 documents were written in 2007, long after Defendant first allowed
24 Plaintiff and numerous others to use the term and logo.  See, e.g.,
25 Kobialka Decl., Ex. 7 (document containing the "2003-2007" footer);
26 see also Kobialka Decl., Exs. 41, 42, 44 (undated documents).
27 Another document is a request for advice posted on the modsquad
28                                    19

1  group.  Kobialka Decl., Ex. 38.  That an individual, presumably a
2  group moderator, sought guidance from a group of other moderators
3  says nothing about any control that Defendant exercised over the
4  groups.

5      Still other documents make statements that sound like rules,
6  but were written by unidentified individuals.  For example, an
7  individual named Nikki McWhinney advised in a post on the modsquad
8  group that pirated copies of CDs and DVDs "are NOT legal and
9  therefore are NOT allowed on Freecycle . . . .  This is not
10  negotiable for ANY country, city or group."  Kobialka Decl., Ex.
11  50.  However, Defendant does not indicate that McWhinney was acting
12  on its behalf to maintain quality control or that compliance with
13  her interpretation of Defendant's rules was enforced.  Further, the
14  posting was made on March 11, 2007, well after the initial
15  permission to use the term and logo.  Similarly, the fact that Beal
16  shared his suggested version of an "etiquette" for his freecycle
17  group does not indicate that other groups were required to adopt
18  the same from the outset.  Kobialka Decl., Ex. 14.  In fact, there
19  is evidence that inclusion of certain parts of the etiquette was
20  not a requirement until September, 2004. Finally, those documents
21  that do contain clear guidance or rules were not posted until well
22  after Defendant granted Plaintiff permission to use the logo.
23  E.g., Kobialka Decl., Ex. 56 (posted October, 2006).

24      Defendant next points to its "incorporation" of Yahoo!'s
25  standards for Yahoo! groups as evidence of further consistency
26  among its groups.  However, Defendant presents no evidence
27  demonstrating that all freecycle groups were required to use Yahoo!

28

United States District Court
For the Northern District of California

1  groups rather than any other service.  Further, the terms and
2  conditions Defendant cites -- "prohibitions on impersonating
3  others, stalking members, sending spam messages, or harassing
4  others" -- cannot reasonably be interpreted to be quality control
5  standards for freecycle services.  Similarly, the 2005 creation, by
6  an individual named Emily, of the Penguin Patrol to monitor groups
7  to identify those "that fail to comply with The Freecycle Netowrk's
8  rules and etiquette, and especially its Trademark policy" is not
9  enough to demonstrate that Defendant had quality control measures
10 in place at the time it started allowing Plaintiff and other groups
11 to use the term and logo.  As Plaintiff notes, Defendant's
12 enforcement of its trademark policy is not relevant to whether it
13 controlled the quality of the services provided by groups using the
14 term and logo.

15     Finally, Defendant argues, "One of the most important quality
16 standards The Freecycle Network upholds is the 'Freecycle Ethos.'"
17 Beal declares as follows:

18         From its inception, The Freecycle Network has cultivated
           and maintained a "Freecycle Ethos" among Freecycle
19         groups that defines the types of interactions that occur
           within its group and the types of people who will
20         participate in its groups.  The Freecycle Ethos involves
           cultivating a positive environment in which individuals
21         are encouraged to act selflessly by giving to others
           without personal gain.  Part of the Freecycle Ethos
22         includes decentralized, democratic leadership that
           allows regional groups to add some rules and procedures
23         to fit the particular needs of their communities as long
           as the core rules and guidelines are followed.  The
24         Freecycle Network's decisions are based in part upon
           input and polling of the volunteer moderators.  This
25         "Freecycle Ethos" of "warm-fuzzy" feelings is an
           essential quality of Freecycle groups that The Freecycle
26         Network has carefully regulated through various rules
           and policies.

27

28
                                    21

1  Beal Decl. ¶ 9.  Defendant implies that Plaintiff mischaracterizes
2  this ethos as a lack of quality standards.  Rather, Defendant
3  argues that this ethos of local flexibility, together with what
4  Defendant characterizes as "policies and procedures" that are
5  "consistent from group to group," is itself an "important quality
6  standard."  Opposition at 14.  However, this argument relies on a
7  presumption of consistent policies and procedures.  As discussed
8  above, Defendant has not produced evidence demonstrating that any
9  policies and procedures were enforced in a meaningful way from the
10 time it started allowing Plaintiff and others to use the term and
11 logo.

12      Even though freecycle services are "relatively simple,"
13 Plaintiff provides evidence that there were no quality controls for
14 a significant number of groups at the time they were created and
15 for many months after they began operating.  Although Defendant has
16 since established quality controls, those controls came months
17 later and it is not clear that they have been strictly enforced.
18 Therefore, the Court finds that Defendant abandoned its control
19 over the term and logo when it allowed Plaintiff and others to use
20 them without exercising adequate quality control over the services
21 provided.

22 II.  Implied Contractual License

23      Defendant next argues that, although it did not explicitly
24 license local groups to use the freecycle term and logo, "it
25 granted implied licenses subject to adherence to the Freecycle
26 Network's policies and procedures."  Oppostion at 15.  Therefore,
27 Defendant argues, it retained "an implied contractual right to

28                              22

United States District Court
For the Northern District of California

1 | inspect and supervise its member groups." <u>Id.</u>

2 | Defendant cites <u>Birthright v. Birthright, Inc.</u>, 827 F. Supp.
3 | 1114 (D.N.J. 1993) to support this theory. However, naked
4 | licensing was not at issue in that case. In fact, the <u>Birthright</u>
5 | court specifically stated that "although either naked licensing or
6 | licensing without reasonable control can work an abandonment,
7 | neither of these conditions exists in this case because defendants'
8 | use was subject to their compliance with the Birthright Charter and
9 | policy directives, as monitored and controlled by the Birthright
10 | Board." <u>Id.</u> at 1139-40 (internal quotations omitted). Unlike
11 | <u>Birthright</u>, where the court "found as fact that plaintiff monitored
12 | and controlled the use of the 'Birthright' name," Defendant has
13 | produced no evidence to rebut Plaintiff's argument and evidence
14 | that Defendant did not monitor or control the services associated
15 | with the use of the term and logo for close to a year after it
16 | first allowed Plaintiff and other groups to use them. <u>Cf. id.</u> at
17 | 1135.

18 | III. Recapture

19 | Finally, Defendant argues that even if it abandoned its marks
20 | in the past, it "has recaptured its rights in the Marks through the
21 | establishment of stringent quality control standards." Opposition
22 | at 24. However, even if Defendant at some point recaptured its
23 | rights to the marks, such recapture came after Plaintiff began
24 | using them. Therefore, Plaintiff's use would have priority over
25 | any rights Defendant regained. <u>See First Interstate Bancorp v.</u>
26 | <u>Stenquist</u>, 1990 WL 299251, at *3 (N.D. Cal.).

27

28

*Left margin:* United States District Court
For the Northern District of California

23

IV.   Effect of Naked Licensing

As discussed above, Defendant abandoned its marks when it allowed Plaintiff and other groups to use the term and logo without maintaining any quality control over the service those groups provided.   Therefore, the Court grants Plaintiff's motion for summary judgment with respect to its first claim for declaratory relief of non-infringement of trademarks.   At oral argument Defendant asserted that summary judgment is not appropriate because Plaintiff seeks a declaration that the marks are in fact generic. However, the complaint clearly seeks two alternative declarations, one of which is a declaration that Plaintiff had a naked license to use the marks.[5]   FAC ¶¶ 45.

Plaintiff also argues that it is entitled to summary judgment on all of Defendant's counterclaims because they are premised upon a valid trademark.   Defendant's counterclaim for unfair competition based on the Lanham Act is based only on Plaintiff's use of the marks.   Therefore, based on the finding of naked licensing, the Court grants Plaintiff's motion for summary judgment with respect to this claim.

However, Defendant's trademark infringement and state unfair competition counterclaims also allege that Plaintiff has improperly induced others to misuse Defendant's marks.   Amended Answer and

United States District Court
For the Northern District of California

---

[5]Because Plaintiff seeks this alternative declaration, the Court need not reach the question of whether granting Plaintiff's motion for summary judgment with respect to naked licensing strips Plaintiff of standing to pursue a declaration of invalidity.   The Court need not reach the question of the trademark's validity to resolve Plaintiff's declaratory relief claim.

1    Counterclaims ¶ 72, 76-79, 95-97.  As discussed above, Defendant
2    argues that, even if it abandoned its rights to the marks, it has
3    recaptured those rights through later controls.  Although
4    Plaintiff's use of the marks is protected by its earlier naked
5    license to use the term and logo, Defendant's counterclaims are not
6    necessarily barred by this naked licensing to the extent they are
7    based upon Plaintiff's later encouragement of others to use the
8    marks in violation of any rights that Defendant might have
9    reclaimed.  Therefore, the Court will not grant Plaintiff summary
10   judgment on Defendant's trademark infringement and unfair
11   competition counterclaims on this basis.

12   V.   Defendant's Trademark Infringement and State Unfair
          Competition Counterclaims
13

14        In <u>Oey</u>, the Ninth Circuit held that, assuming TFN had a
15   legitimate mark, Oey's encouragement of others to use the mark in a
16   manner that might render it generic "was not likely to cause
17   confusion, mistake, or deceive anyone as to the connection of Oey's
18   services (or any other) with TFN."  505 F.3d at 903.  Therefore,
19   these actions could not have been a violation of 15 U.S.C.
20   § 1125(a)(1).  Further, the <u>Oey</u> court held that these actions "do
21   not satisfy the requirements for false advertising,
22   misrepresentation, or unfair competition under § 1125(a)(1)(B)"
23   because there is "no evidence that Oey's statements were made in
24   'commercial advertising or promotion.'"  <u>Id.</u>  Therefore, the court
25   held that the grant of a preliminary injunction against Oey based
26   on a trademark infringement claim was not appropriate.  <u>Id.</u>

27

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendant argues that, because Plaintiff's use of the mark was
2  different from Oey's, the Oey decision does not require granting
3  Plaintiff's motion.  However, as discussed above, the naked license
4  given to Plaintiff provides the basis for granting the motion with
5  respect to Plaintiff's own use of the mark.  The only remaining
6  basis for Defendant's claims is Plaintiff's later encouragement of
7  others to use the marks in a generic manner.  This activity is
8  analogous, if not identical to Oey's actions.  Therefore, the Court
9  also grants Plaintiff's motion for summary judgment with respect to
10 Defendant's trademark infringement claim.
11     However, neither party has addressed whether such acts
12 constitute a violation of California Business and Professions Code
13 § 17200.  Plaintiff argues that Defendant's § 17200 claim
14 necessarily fails because its Lanham Act claims fail.  However, the
15 cases cited by Plaintiff involve situations in which there was no
16 protectable trademark.  Defendant has not addressed this claim in
17 its papers.  Although the Oey decision forecloses Defendant's
18 argument that encouraging others to use a mark in a generic manner
19 is prohibited under the Lanham Act, it does not address whether
20 such activity constitutes unfair competition under California law.
21 VI.  Plaintiff's Tortious Interference Claim
22     Plaintiff argues in its supplemental motion that it is also
23 entitled to summary judgment on its tortious interference with
24 business relations claim.  Defendant first argues that this issue
25 is not properly before the Court because Plaintiff did not seek
26
27
28                              26

1   summary judgment on the claim in its initial motion.  Plaintiff
2   counters that the Court should address the issue because the Ninth
3   Circuit's decision in Oey supports a grant of summary judgment in
4   its favor.  Because Defendant has had an opportunity to respond to
5   Plaintiff's argument and because the Ninth Circuit decision
6   provides further support for that argument, the Court will address
7   it.

8       In order to prevail on its tortious interference with business
9   relations claim, Plaintiff must demonstrate that (1) it had a valid
10  contract with a third party; (2) Defendant had knowledge of the
11  contract; (3) Defendant intentionally acted to induce a breach or
12  disruption of that contractual relationship; (4) the contract was
13  disrupted or breached; and (5) Plaintiff suffered damages.  Pac.
14  Gas & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126
15  (1990).  Plaintiff's claim is based on its allegation that
16  Defendant requested that Yahoo! terminate the freecyclesunnyvale
17  Yahoo! group.  Defendant argues that there are triable issues of
18  fact with respect to the second and fifth elements and its
19  affirmative defense of privilege.

20      Defendant argues that there is no evidence that it was aware
21  that Plaintiff existed.  Therefore, Defendant contends, there
22  remains a question of fact whether it could have had knowledge of a
23  contract between Plaintiff and Yahoo!  However, there is evidence
24  that, on November 21, 2005, Defendant's trademark agent Sarah
25  Blouin contacted Yahoo!, stating that she had a good faith belief
26
27
28                                  27

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   that the freecyclesunnyvale Yahoo! group was infringing Defendant's

2   protectable trademark rights and requesting that Yahoo! terminate

3   the freecyclesunnyvale group. Evans Decl., Ex. C. As Plaintiff

4   notes, it is clear that Defendant was aware that a contract existed

5   between Yahoo! and some entity. Moreover, there is evidence that

6   Defendant had been in communication with Oey and other

7   freecyclesunnyvale Yahoo! group moderators in the weeks leading up

8   to its request that Yahoo! terminate the Yahoo! group. That

9   Defendant was unaware of the fact that Plaintiff considers itself

10   an unincorporated organization called FreecycleSunnyvale is not

11   enough to refute Defendant's knowledge of the entity and its

12   contract.

13      Defendant next argues that there is a triable question of fact

14   whether Plaintiff was damaged by Defendant's actions. Defendant

15   first contends that Abraham and Oey's deposition testimony

16   regarding the loss of members when the Yahoo! group was terminated

17   is not consistent. However, as Plaintiff notes, there is nothing

18   inconsistent between Abraham's testimony that Plaintiff lost

19   "hundreds" of members and Oey's testimony that, as of the date of

20   his August, 2007 deposition, the new sunnyvalefree Yahoo! group had

21   about 800 members. As stated above, Oey also declared that the

22   freecyclesunnyvale Yahoo! group had approximately 2200 members when

23   it was terminated. The difference between 2200 and 800 is

24   accurately described as "hundreds." Next, Defendant notes

25   inconsistencies in testimony regarding the length of time between

26

27

28

1  the termination of the freecyclesunnyvale Yahoo! group and the
2  creation of the sunnyvalefree Yahoo! group.  However, this fact is
3  relevant only to the extent of damages suffered.  Plaintiff has
4  abandoned its claim for money damages.  Therefore, the extent of
5  its damages is no longer relevant.

6      Finally, Defendant cites <u>Richardson v. La Rancherita</u> in
7  support of its argument that it had "sufficient justification" for
8  asking Yahoo! to terminate the freecyclesunnyvale Yahoo! group.  98
9  Cal. App. 3d 73, 80 (1979).  In <u>Richardson</u>, the California Court of
10 Appeal held that a defendant's interference with a plaintiff's
11 contract is privileged if "(1) he has a legally protected interest,
12 (2) in good faith threatens to protect it, and (3) the threat is to
13 protect it by appropriate means."  <u>Id.</u> at 81.  Here, there is a
14 triable question of fact whether Defendant acted in good faith when
15 it asked Yahoo! to terminate the freecyclesunnyvale Yahoo! group.
16 Although the Court now finds that Defendant did not have a legally
17 protected interest in the mark as to Plaintiff, the law is not
18 clear whether a good faith belief that Defendant had a legally
19 protected interest is sufficient to afford this protection.  <u>See</u>
20 <u>McReynolds v. Short</u>, 564 P.2d 389, 394 (Ariz. 1977) (interference
21 justified where defendant "honestly believed" he had a legally
22 protected interest); Restatement (Second) of Torts § 773.

23     Therefore, the Court denies Plaintiff's motion for summary
24 judgment with respect to its tortious interference claim.

25                              CONCLUSION
26     For the foregoing reasons, the Court GRANTS IN PART
27 Plaintiff's motion for partial summary judgment and supplemental
28
                                   29

United States District Court
For the Northern District of California

motion for summary judgment and DENIES THEM IN PART (Docket Nos. 76, 131).[6]

IT IS SO ORDERED.

Dated:  3/13/08

CLAUDIA WILKEN
United States District Judge

United States District Court
For the Northern District of California

---

[6]Defendant has filed a motion to strike the declaration of Miles Robertson filed by Plaintiff in support of its motion for summary adjudication.  The Court did not rely upon that declaration in deciding this motion.  Defendant's motion to strike is GRANTED (Docket No. 101).